**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,**

v.

**NAVAJO REFINING COMPANY, Defendant-Appellant.**

No. 77–1998.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 29, 1978.

Decided March 13, 1979.

Juan Ramon V. Gomez, Atty., Washington, D.C. (Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, Equal Employment Opportunity Commission, Washington, D.C., with him, on brief), for plaintiff-appellee.

Joel M. Carson of Losee & Carson, Artesia, N.M., for defendant-appellant.

Before McWILLIAMS, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal by defendant Navajo Refining Company (Navajo) from a finding of civil liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, after trial on a complaint filed by the Equal Employment Opportunity Commission (EEOC).

The issues on appeal are: 1) whether injunctions were properly granted which disallow Navajo's use of a high school diploma (or GED equivalent) and a passing grade on a certain test as a prerequisite to employment until such requirements are

validated by the EEOC; and 2) whether back pay awards to Cruz Acosta, Blas Salgado, Jr., and Henry L. Lopez were justified.

Navajo is a partnership formed in 1969 for the specific purpose of acquiring from Continental Oil Company (Conoco) a refinery located at Artesia, New Mexico. The partnership—made up of Holly Corporation and Navajo Corporation—assumed full control of the refinery and its operations in May, 1969.

From the time of acquisition until the trial court's judgment, Navajo had two mandatory prerequisites for employment at entry level positions in its refinery department: an applicant had to have a high school education (or GED equivalent) and receive a satisfactory score on an aptitude test. From 1969 through July, 1973, the test used was one developed and administered by the New Mexico Employment Security Commission (ESC). During this period, Navajo believed that the test complied with EEOC and Office of Contract Compliance (OFCC) requirements and was an acceptable means of screening new employees. Also during this time, ESC acted almost exclusively as the source of applicant referrals to Navajo for new employees in the refinery department.

In July, 1973, however, the ESC notified Navajo that the test was not considered by the EEOC to be valid, and that ESC would no longer administer it. As a result, Navajo obtained another aptitude test from Conoco's Lake Charles, Louisiana testing program and itself administered that to prospective entry level employees of the refinery department. Navajo's evidence was that this second test had been submitted to t he OFCC for approval, but had neither been validated nor rejected by that office. Since 1975, statistical adjustments have been made to equalize the raw scores of Spanish surnamed Americans (SSA) and Anglo applicants. Navajo uses a score conversion table to make these adjustments, and the result is less than a one per cent difference in the average scores of Anglo and SSA applicants, which insures neutrality in the impact of the test on Anglo as compared with SSA applicants. The trial court found that with the score adjustments there was no disparate impact on minorities, but issued the injunctions and made the back pay awards because of its views as to the disparate impact of the test and education requirements in excluding SSA's from consideration for hiring. We do not agree.

To carry its burden of proof in a Title VII case, a complaining party must first make a prima facie showing of discrimination. This is established when it is demonstrated that a defendant's employee selection practices, while perhaps facially neutral and lacking in intent to discriminate, have a discriminatory effect or disparate impact on minority hiring. *See* 42 U.S.C. § 2000e–2(h); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Statistically, disparate impact can be shown in a variety of ways. It may be demonstrated that a minority, as a class, is excluded from employment at a greater rate than whites. Or, statistics can show that a larger percentage of minority applicants are eliminated by a test. Finally, the percentage of minorities hired can be compared with the minority population in a specific available work force to see if employment rates compare favorably with the community makeup. *Griggs v. Duke Power Co., supra* at 430 n. 6, 91 S.Ct. 849; *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 272 (10th Cir. 1975). If a prima facie case is established the burden of proof shifts to the defendant to show the criteria are "job related." *Albemarle Paper Co. v. Moody, supra; Griggs v. Duke Power Co., supra.*

The Supreme Court has considered the problem of a seemingly neutral testing program "freezing in" racially discriminatory hiring practices of prior years, *Griggs v. Duke Power Co., supra,* and those testing procedures which serve as artificial barriers to employment, *Albemarle Paper Co. v. Moody, supra.* Most recently, in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53

L.Ed.2d 786 (1977), it decided whether height and weight requirements operated to disqualify a disproportionate number of female applicants and therefore excluded a large number of females from actual employment in the Alabama Prison system. But the Supreme Court has not dealt specifically with the issue presented in this case, where an education requirement and aptitude test eliminate from the pool of applicants a greater number of Spanish surnamed Americans (SSA) than Anglos, but the actual percentage of SSA's hired compares favorably with the percentages under any appropriate measure. In all of the cases it has considered the statistics showed a pattern of discriminatory employment, thereby requiring the company to justify its use of the tests as not only job related but racially neutral.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), this Court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." *Id.*, at 432, 91 S.Ct. 849. *This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination, i. e., has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants.* See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). (Footnote omitted.) (Emphasis supplied.)

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

■■ We start from the proposition that Title VII does not impose on an employer the duty to favor a minority, discriminated against in the past, in order to correct pre-Act racial imbalances. 42 U.S.C. § 2000e—

2(j). The assumption is that non-discriminatory hiring practices will eventually rectify racial disparities in the employee population. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Navajo here acquired the refinery as a going concern from an unrelated owner in 1969. Therefore it is appropriate to consider only hiring statistics since that date. The evidence at trial concentrated almost exclusively on refinery department employment practices. We know of no complaint or aggrieved individual from other departments within Navajo. Consequently, analysis is limited to the alleged discriminatory hiring within Navajo's refinery department. *See Taylor v. Safeway Stores, Inc.*, 524 F.2d, *supra*, at 270.

Navajo's hiring record for Spanish surnamed Americans as compared to Anglos who have applied for employment at the refinery department has been good. Of the 267 who applied for entry level employment from 1969–1973, 80 (30%) were SSA's and 187 (70%) were Anglo. During that time, of the 21 new entry level employees hired, 8 (or 38%) were SSA's.[1] Chaves and Eddy counties in New Mexico supply most of the work force. The percentage of SSA's hired during the period at issue exceeded significantly the percentage of SSA's in the available work force, found to be 23.2% by the Court (ESC's estimate was 19%).

There is a disparity between SSA's and Anglos in these counties as to numbers who have a high school education or the GED equivalent, and with respect to the pass rate on the tests before the racial factor adjustment is made. But we do not get to that point unless there is discrimination in fact in actual numbers hired. As stated in *Hester v. Southern Ry.*, 497 F.2d 1374, 1381–82 (5th Cir. 1974):

[N]onvalidated tests and subjective hiring procedures are not violative of Title VII *per se*. Title VII comes into play only when such practices result in discrimina-

---

1. During 1969 of five hired, two were SSA (40%)

    1970 of four hired, one was SSA (25%)

    1971 of three hired, two were SSA (66%)

    1972 of one hired, none was SSA (0%)

    1973 of eight hired, three were SSA (38%)

tion. At that point, the burden of producing evidence shifts to the employer, who must offer satisfactory justification for his procedures. . . .

. . . . .

The missing ingredient in the proof here was the necessary showing of discrimination. Without such proof the district court lacked authority to enjoin the further use of the testing and interviewing procedures by Southern for selection of Data Typists. . . .

*See also, Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).

■■ The high school education requirement and the tests are racially neutral on their face, although they have not been shown to be job related. "But Congress directed the thrust of the Act to the *consequences* of employment practices, . ." *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). The statute prohibits discrimination on "race, color, religion, sex, or national origin" grounds only. 42 U.S.C. § 2000e–2(a). Thus, the company is free to use its tests and high school education requirements if the result is not discrimination in fact. When 30% of the applicants for jobs are SSA's, from a work force in the community of 23.2% SSA's, and 38% of the persons hired by Navajo (all of whom start at the same job level) are SSA's, the requirement of proof of discrimination is not met.

Salgado, Acosta and Lopez all applied for employment in 1971. Salgado and Acosta failed the test and were not offered employment. Lopez was not permitted to take the test because the New Mexico Employment Security Commission mistakenly thought he had not graduated from high school. A clerk had indicated he was "in school," but that was a computer course he was taking after graduation. We note that in 1971 Navajo hired only three people of whom two were SSA's, 66⅔%. In the face of this and our holding above that no discrimination against SSA's was shown on the part of Navajo, the back pay awards cannot stand.

The case is reversed and remanded with instructions to dismiss the injunctions against Navajo's use of the test and the high school education requirement, and to vacate the back pay awards.