595 F.2d 190
 19 Fair Empl.Prac.Cas. 652, 19 Empl. Prac.
Dec. P 9095
Willy WHACK, Appellant,
v.
PEABODY & WIND ENGINEERING CO. and Sheet Metal Workers
International Association, Local 19.
 No. 78-2097.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 15, 1979.
Decided April 3, 1979.
 
 Dona S. Kahn (argued), Harris & Kahn, Philadelphia, Pa., for appellant.
 Steven R. Waxman (argued), Bolger & Picker, Philadelphia, Pa., for appellee.
 Before ALDISERT, ADAMS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 PER CURIAM.
 
 
 1
 Plaintiff Willy Whack appeals from a judgment by the district court rejecting his race discrimination claim brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e Et seq., as amended. The trial judge, after hearing testimony from Whack, several representatives of the defendant company, and a statistical expert, concluded that "race was not a factor" in the decision to lay-off the plaintiff.[1] Because we cannot say that the district court erred in concluding that Whack failed to carry his burden of proof in this regard, we affirm its judgment.
 
 I.
 
 2
 Peabody & Wind Engineering Co. (Peabody) is a company specializing in the heating, ventilating and air conditioning phases of the construction industry. Its principal operation is in Philadelphia, Pennsylvania, but it has many employees at various job sites "in the field." The great majority of Peabody's employees are sheet metal workers, generally members of Local 19 of the Sheet Metal Workers International Association (Local 19), although in recent years the company has also employed so-called "blue label" workers, who perform non-construction related work formerly done by Local 19 members.[2]
 
 
 3
 In September, 1970, Peabody hired Willy Whack as a sheet metal worker in its main shop. Whack had had some welding experience, but had not participated in the apprenticeship program generally required for union membership and therefore began working at Peabody pursuant to a special permit. Permits of this nature are provided to men who have not gone through the regular apprenticeship program when the regular union rolls are exhausted and additional manpower is needed. In 1972 Whack became a full member of the union, as a permit worker may, with union permission, even though he had not completed the formal apprenticeship program.
 
 
 4
 As the grant of a permit suggests, the early seventies was a period of relative prosperity, both for Peabody and for sheet metal workers generally. By 1973, however, recession and severe unemployment set in, and many workers at Peabody's Philadelphia facility had to be laid off. Peabody's practice was to leave the choice of which employees would be retained in the hands of individual supervisors, who were closer to the work and to the employees, and who, it was assumed, were best able to determine which workers would be the most productive, considering the amount and type of work available.
 
 
 5
 Under normal circumstances, Whack might have been one of those discharged in 1973, but instead he was transferred to "the field" to work on a new Peabody job: the construction of a nuclear power plant at Salem, New Jersey. Such a transfer was uncommon at Peabody, where the main shop and the field sites operated almost as two different companies.[3] But the new work required experienced welders and this need resulted in Whack's transfer to Salem.
 
 
 6
 Whack was the only black employee working at the Salem site,[4] and encountered some racial antagonism from a few of his fellow workers. This antagonism was apparently individual in nature and did not involve either company or union representatives. When plaintiff complained to his supervisor about this matter, steps were taken to deal with the problem.[5] Thereafter plaintiff made no further complaints on this subject.
 
 
 7
 On January 9, 1976, Whack was laid off. The work force at Salem had reached a high of over sixty sheet metal men in mid-1975, but as the project neared completion, the need for workers inevitably slackened. Moreover, the winding down of the Salem project paralleled a general economic decline in the industry. According to one estimate as many as thirty-three to forty percent of the Local 19 members were unemployed.[6] When Peabody laid off Whack and the nine other men discharged on the same day, the work force at Salem became a skeleton crew of only ten. As was the company's practice, the decision regarding who would be retained was delegated to the on-site supervisor, in this case Edward Lampe. In Lampe's judgment the ten men discharged on January 9, 1976 were less useful in completing the job than the ten retained.[7]
 
 
 8
 Plaintiff, charging that his dismissal was racially motivated, sought relief from his union, but the union concluded that he had no justifiable grievance. Whack also filed a charge with the Equal Employment Opportunity Commission and was issued a right to sue letter, whereupon he filed this suit in the district court. The trial judge determined that plaintiff, as a minority worker who had been dismissed from a job for which he was ostensibly qualified, had established a Prima facie case of racial discrimination under the rules established by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Upon considering the company's explanation, however, the court determined that plaintiff's discharge was not discriminatorily motivated, and that the company's procedures in determining who would be discharged were not discriminatory in practice. Whack now appeals to this Court.II.
 
 
 9
 Under McDonnell Douglas, a title VII case is divided into three phases. First the plaintiff must demonstrate a Prima facie case of discrimination. Then the defendant is called upon to articulate a legitimate non-discriminatory reason for its action. Finally, the plaintiff is afforded an opportunity to show that the proffered reason is in fact a pretext designed to cover what is actually an illegal discrimination.
 
 
 10
 This tripartite arrangement is a useful tool in analyzing these controversies, but it should not be construed so as to divide a single cause of action into three different cases. Thus there are no hard and fast rules as to what evidence must be considered as constituting a Prima facie case and what evidence is needed in order to establish a pretext.[8] Most importantly, the ultimate burden of persuading the fact-finder that there has been illegal discrimination resides always with the plaintiff.[9] We will thus review the judgment of the district court not with an eye to strict adherence to form, but in order to determine whether the decision on the merits of plaintiff's case is clearly erroneous on the facts, or uncongenial to previously enunciated legal standards.[10]
 
 
 11
 Whack has successfully established that he is a minority worker discharged from a job for which he was allegedly qualified. He has also asserted that less qualified white workers were retained. The district court concluded that this showing was sufficient to establish a Prima facie case.[11] Assuming that this ruling is correct, and it is not challenged by Peabody, the defendant was required to articulate a legitimate non-discriminatory reason for Whack's discharge. It sought to do so by explaining the depressed economic situation confronting the industry in early 1976, and by demonstrating that the crew at Salem was reduced in a single year from over sixty men to ten. Among those laid off was Whack, but he could not expect to be immune from the reduction of the Salem work force or from an economic problem that affected the entire industry. "(T)he Act does not command that any person be hired simply because he . . . is a member of a minority group."[12] The Peabody management, faced with the necessity of laying off large numbers of workers, delegated to its work supervisors the task of ascertaining which employees were the most productive and which were expendable. Supervisor Lampe testified that Whack was less qualified than the few men retained because he was unwilling to do work requiring climbing and was less skilled at certain jobs than those who were left on the payroll.[13] Whack disputes this and argues that he was as well qualified or better qualified than every employee at the Salem project. We do not believe, however, that it was error on the part of the district judge to credit the testimony of Lampe and others and to conclude that the supervisor exercised his best judgment without allowing plaintiff's race to affect his decision.
 
 
 12
 But even if Lampe acted in complete good faith it would not be impossible for Whack to prevail. It is now well settled that a Title VII plaintiff need not prove that a particular procedure is racially motivated if he or she can establish that the procedure, in practice, has a discriminatory impact on members of a particular racial group, and cannot be defended as a business necessity. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[14] The procedures at issue here, in which critical decisions were left to the discretion of supervisors uninstructed by any set guidelines, have been found to be invalid when the effect of such a system greatly favors certain racial groups over other groups.[15] Accordingly, we must consider the district court's treatment of Whack's statistical evidence, which purported to show such a disparate impact.
 
 
 13
 Whack was unable to demonstrate any such impact on other black Local 19 workers for two reasons. First there were only five black union members employed by Peabody at the time of trial too few to establish a meaningful statistical case. Second, it appears from the record that none of the other blacks was laid off. Thus Whack could not make out a case of discrimination as to the black members of his own class of workers because he was the only member of that group to be discharged.
 
 
 14
 Plaintiff therefore attempted to show a disparate impact on black "blue label" workers. But he was unable to persuade the district court that the company's treatment of unskilled blue label workers should be given great weight in evaluating its treatment of skilled union workers.[16] Although the experience of different groups of workers employed by the same company may be relevant in certain contexts, we cannot say that it was reversible error for the trial judge to refuse to attach substantial significance to the evidence offered here in determining whether plaintiff had established pretext.
 
 
 15
 In sum, as the district court determined, plaintiff failed to prove that Peabody's lay-off procedures were either discriminatory in purpose or discriminatory in effect. It is clear from the record that the size of Peabody's work force fluctuated greatly depending on the amount and type of work available and that "hires", "lay offs" and "rehires" were frequent occurrences. The insecure nature of such employment is a burden carried by all Peabody's sheet metal workers, both white and black. We cannot say that the trial judge erred in concluding that Whack failed to show that race played any role in the bearing of this burden.
 
 
 16
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 Whack v. Peabody & Wind Engineering Co., 452 F.Supp. 1369, 1371 (E.D.Pa.1978)
 
 
 [2]
 Local 19 workers include regular journeymen, apprentices and limited apprentices referred to as "yellow label" workers. They are hired through the union and must serve an apprenticeship, pass a welding test, and have a high school diploma. Under certain circumstances, a welder may become a Local 19 member after having worked at a union site with a union permit, and without completing a rigorous training program. This was the case with the plaintiff here
 Blue label workers, on the other hand, are hired directly "off the street" and are, presumably, less skilled than their yellow label counterparts. They are paid less than Local 19 workers and do not participate in construction-rate work.
 See App. 132-33; Deposition of John McFadden, Jr., 17-22 (October 18, 1977).
 
 
 [3]
 App. 142; Deposition of John McFadden, Jr., 33 (October 18, 1977)
 
 
 [4]
 Peabody employs four other black Local 19 members, but none of these was at Salem
 
 
 [5]
 A. 200-01
 
 
 [6]
 Deposition of Aloysius F. Curran, 18 (November 8, 1977)
 
 
 [7]
 Whack testified that in his judgment he was as well qualified or better qualified than the men who were retained. App. 34-37. Lampe's assessment differed. App. 212-17
 
 
 [8]
 For instance, in McDonnell Douglas, the Supreme Court noted that statistical data showing the impact of a defendant's employment policies on specific racial groups may be helpful in establishing pretext. 411 U.S. at 805 & n.18, 93 S.Ct. 1817. Yet, in another context, this Court found such evidence convincing in the establishment of a Prima facie case. Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 259 (3d Cir. 1975), Vacated and remanded on jurisdictional grounds, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). As the Supreme Court stated in McDonnell Douglas the elements of Prima facie proof may vary according to the factual situation. 411 U.S. at 802, n.13, 93 S.Ct. 1817. See McDonald v. Santa Fe Transp. Co., 427 U.S. 273, 279 n.6, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)
 
 
 [9]
 Board of Trustees of Keene State College v. Sweeney, --- U.S. ----, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)
 
 
 [10]
 Whack argues on appeal that the district court did not consider some of his evidence as "pretext" evidence. The district court opinion does state that plaintiff presented no "rebuttal evidence," 452 F.Supp. at 1372 n.2, but we do not take this to mean that the district judge failed to consider any of plaintiff's evidence arguably going to pretext. Rather, plaintiff presented all of his evidence first, and did not seek to introduce new evidence after the presentation of defendant's case. So long as the plaintiff is given a full opportunity to present all of his or her evidence, and that evidence is considered by the court, we do not read McDonnell Douglas to require that it be given in any particular order. Thus, although plaintiff did present evidence going to the question of pretext, the district court committed no reversible error in refusing to label it "rebuttal" evidence
 
 
 [11]
 This Court has not been overly demanding in the proof required for a Prima facie case. See Rodriguez v. Taylor, 569 F.2d 1231, 1239 (3d Cir. 1977). Usually, however, some showing must be made that plaintiff was treated differently from similarly situated individuals of different racial groups
 
 
 [12]
 Griggs v. Duke Power Co., 401 U.S. 424-31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)
 
 
 [13]
 Representatives of the company gave several reasons for their judgment that Whack was less qualified than the men retained. Some of the remaining work at Salem required climbing, which, it is asserted, Whack refused to do. App. 210-11. Moreover, although his welding work was conceded to be acceptable, his overall ability was doubted, given his failure to take any of the industry-wide training or apprenticeship programs designed to produce well rounded journeymen. App. 135-41; App. 208-17. One such program was a special program for minority workers
 
 
 [14]
 The Supreme Court made clear in Griggs that title VII was concerned with the impact of procedures as well as the motive behind their adoption:
 What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.
 401 U.S. at 430-31, 91 S.Ct. at 853.
 
 
 [15]
 See, e. g., Rowe v. General Motors Corp., 457 F.2d 348, 358-59 (5th Cir. 1972)
 
 
 [16]
 452 F.Supp. at 1372-73