**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

v.

**GREYHOUND LINES, INC., (2 Cases) Appellant.**

Nos. 79–2824, 80–1154.

United States Court of Appeals, Third Circuit.

Argued Aug. 6, 1980.

Decided Oct. 15, 1980.

Barry Simon (argued), Nicholas N. Price, Jane Ruddell, Philadelphia, Pa., for appellant; Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.

Leroy D. Clark, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Lutz Alexander Prager, Marcia B. Ruskin (argued), Attys., Equal Employment Opportunity Commission, Washington, D. C., for appellee.

Before ALDISERT and SLOVITER, Circuit Judges, and RAMBO, District Judge.*

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

We are to decide whether the plaintiff met the necessary burden of proving that Greyhound Lines' facially neutral no–beard job qualification policy had a discriminatory effect against black workers. In a race discrimination complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, the Equal Employment Opportunity Commission (EEOC or Commission) challenged the legality of Greyhound's policy that prohibits the wearing of beards by employees holding public contact jobs. It brought this action in behalf of Jeffrey B. Ferguson, a twenty–seven year old black male who has a skin condition called pseudofolliculitis barbae (hereinafter PFB), which predominantly affects black males who shave. After a bench trial the district court found in favor of the Commission and directed Greyhound to offer employment to Mr. Ferguson in the public contact job of ticket agent. Greyhound has appealed. We reverse.

### I.

Greyhound provides inter–city bus transportation as a common carrier in competition with other buses, railroads, and airlines

---

* Honorable Sylvia H. Rambo, of the United States District Court for the Middle District of Pennslyvania, sitting by designation.

as well as with the private automobile. For more than eighteen years it has established and enforced appearance and grooming standards that include a proscription against beards. The no–beard portion of Greyhound's policy directive provides: "Beards, goatees, mutton chops or other facial hair growths of an extreme or bizarre style are neither acceptable nor permissible and are calculated to impair the neat and tidy personal appearance which is critically requisite and, accordingly, may not be worn." Exh. P–11, D–1; App. at III–17a, III–117a. Prior to the summer of 1976, appearance standards including the no-- beard policy were applied to all employees at Greyhound's Philadelphia terminal, including employees whose positions did not involve public contact. Greyhound changed its policy in the summer of 1976 to permit terminal employees not serving in public contact jobs to wear beards.

Greyhound hired Ferguson at its Philadelphia terminal as a telephone information clerk on June 9, 1974, when the no–beard policy applied to all positions. When he was hired he was advised of the appearance standards including the requirement that employees be clean shaven. The record discloses that he did not wear a beard when first hired, that he did not grow a beard until two years later, that his employment was interrupted from time to time while he returned to college, and that while attending college he did not grow a beard. When he grew his beard he was still employed in the non–public contact position of telephone information clerk, but he later bid for the public contact position of ticket agent. Greyhound refused to consider him for that position because he did not satisfy the no–beard rule.[1] This lawsuit followed.

II.

Greyhound appealed from both critical findings of fact and conclusions of law entered by the district court. Because of the view we take it will be unnecessary to consider all of Greyhound's arguments.[2] Moreover, the view we take proceeds along an assumption, not briefed or placed in issue here or in the district court, that under Title VII it is legally possible to establish a disparate impact case on the basis of an employer's no–beard policy. We make clear at the outset that this is only an assumption and that this ultimate issue has not been met or decided in this court.[3]

1. The district court found that Ferguson had a severe case of PFB and that growing a beard was the only effective remedy. *EEOC v. Greyhound Lines, Inc.*, 494 F.Supp. 481, 483 (E.D. Pa.1979). Greyhound argues that this finding is clearly erroneous. We find it unnecessary to resolve this dispute on appeal. *See* note 2, *infra.*

2. The district court held that EEOC had established a prima facie case of unlawful discrimination and that Greyhound had failed to establish its defense of business necessity. *EEOC v. Greyhound Lines, Inc.*, 494 F.Supp at 484–485. Because we conclude that EEOC failed to make out a prima facie case, we need not consider, and we specifically do not meet, Greyhound's business purpose defense. *See also* note 1, *supra.*

3. We have assumed, arguendo, that a prima facie case of racial discrimination might have been established by competent statistical evidence that a substantially disproportionate number of black males suffer from skin diseases or conditions that require them to wear beards. We are concerned, however, that the EEOC may have seriously misconceived the nature and purpose of both Title VII and the disparate impact theory that has been built upon it. The history of the Civil Rights Act of 1964, of which Title VII is an important part, demonstrates that its purpose was to outlaw *racial* discrimination. The wearing of beards is not a characteristic that is peculiar to any race. Nor can the incidence of beard–wearing among black workers be attributed to a long history of inferior education in segregated schools, unlike the uneven test scores at issue in *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). In short, had the issue been properly briefed and argued by the parties before us, it is possible that we may have been willing to hold that a policy against beards simply cannot constitute a Title VII violation. "Even a completely neutral practice will inevitably have *some* disproportionate impact on one group or another. *Griggs* does not imply, and this Court has never held, that discrimination must always be inferred from such consequences." *City of Los Angeles Department of Water and Power v. Manhart*, 435 U.S. 702, 711 n.20, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978) (emphasis in original). However, we specifically do not meet this issue in these proceedings.

The Commission did not contend, and the district court did not determine, that Greyhound adopted its no–beard policy with the purpose or intent to discriminate against black employees. Rather it sought to prove racial discrimination under the disparate impact theory. To prevail on this theory, EEOC had to demonstrate that members of Ferguson's race suffered substantially disproportionate effects from the application of a seemingly neutral policy. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–32, 91 S.Ct. 849, 853–854, 28 L.Ed.2d 158 (1971). We have concluded that the plaintiff failed to prove that the employment of blacks was substantially disproportionately affected by the no–beard policy, and therefore that it failed to establish a prima facie case of racial discrimination.

Proof of actual discrimination in employment is a necessary element of every disparate impact case. Employers are not required to justify every employment practice or qualification. It is only after the plaintiff has made a prima facie showing of discrimination that the employer is required to go forward with evidence to justify the practice as job related and racially neutral:

> In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), this Court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." *Id.*, at 432, 91 S.Ct. at 854. *This burden arises, of course, only after the complaining party or class has*

*made out a prima facie case of discrimination, i. e., has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants.*

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (footnote omitted) (emphasis added). *See also, e. g., Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977).

In this case, however, EEOC produced no evidence that Greyhound's no–beard policy selects applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. To the contrary, statistical evidence introduced at trial by Greyhound establishes the absence of any discriminatory consequences in the application of the no–beard rule. The undisputed statistics show that from at least 1974 through the end of 1978 the percentage of black male employees to total male employees in jobs at the Philadelphia terminal covered by the no–beard policy has exceeded substantially the comparable percentage of black males in the labor force and in the general population in the Philadelphia Standard Metropolitan Statistical Area (SMSA). For every year since 1974, black males held more than twenty percent of the jobs subject to the no–beard policy at the Philadelphia terminal, but comprised only approximately fourteen percent of the total male population in the Philadelphia SMSA labor force and approximately fifteen percent of the total males in the general population.[4] Furthermore, although the

4. *Summary of Racial Composition of Male Work Force Greyhound Lines Inc.'s Philadelphia, Pa. Terminal Jobs Covered by Personal Appearance Code*

| Reporting date | Males in jobs covered by appearance code | Black males in jobs covered by appearance code | Percentage of black males in jobs covered by appearance code |
|---|---|---|---|
| 12-31-78 | 371 | 99 | 26.6% |
| 6-30-78 | 328 | 85 | 25.9% |
| 12-31-77 | 374 | 103 | 27.5% |
| 6-30-77 | 386 | 99 | 25.6% |
| 12-31-76 | | NOT AVAILABLE | |
| 6-30-76 | 426 | 113 | 26 5% |
| 6-30-76 | 441 | 120 | 27.2% |
| 12-31-75 | 403 | 96 | 23.8% |
| 9-30-75 | 403 | 95 | 23.5% |
| 6-30-75 | 437 | 97 | 22.2% |
| 3-31-75 | 408 | 99 | 24.3% |
| 12-31-74 | 420 | 105 | 25 % |
| 9-30-74 | 420 | 98 | 23 3% |
| 6-30-74 | 498 | 126 | 25.3% |
| 3-31-74 | 395 | 81 | 20.5% |

Exh. D-17, App. at III–214a. There are two entries for June 30, 1976, because prior to that date the no–beard rule applied to all employees

total number of black males subject to the personal appearance code ranged from a low of eighty–one to a high of 120 during this period, EEOC did not present any evidence to show that any black male at the Philadelphia terminal, other than Mr. Ferguson, wanted to grow a beard because he suffered from PFB.[5]

■ EEOC could not contend, in the face of this data, that black males were under-represented in Greyhound's workforce. It argues, however, that a disparate impact case can be established without proof of a discriminatory effect on the workforce. In support of that proposition, it relies primarily on the following passage from *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978): "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force." *Id.* at 579, 98 S.Ct. at 2950 (emphasis in original). Read in its context, however,

*Furnco* does not support the Commission's argument. *Furnco* was not a case of disparate impact, but a case of "disparate treatment" under the theory of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). There can be no doubt that each worker is entitled to equal treatment regardless of his race; hiring members of a racial group in proportion to its share of the population does not license an employer to treat subsequent applicants unfairly on account of their race. *Furnco* does not apply to the case before us, however, where there is no allegation of disparate treatment on account of race but only that a facially neutral policy has had a disparate impact.

We hold, therefore, that no violation of Title VII can be grounded on the disparate impact theory without proof that the questioned policy or practice has had a disproportionate impact on the employer's workforce. This conclusion should be as obvious as it is tautological: there can be no disparate impact unless there is a disparate impact. Our holding agrees with that of the

---

in the terminal and after that date telephone information clerks and ticket office clerks were permitted to wear beards. The data take into account and reflect that change in policy. App. at II–193a–94a.

Greyhound introduced data from the 1970 census showing that 14.3% of the total males in the labor force in the Philadelphia SMSA are black. Exh. D–19, App. at III–240a. The 14.3 percent figure was calculated as follows:

$$\text{Total Black Male Labor Force} = \frac{178,553}{1,246,366} = 14.3\%$$

Total Male Labor Force

**5.** EEOC argues that such evidence should not be required because a larger percentage of black males than white males are deterred from applying to Greyhound by the no–beard requirement. It relies on the following passage from *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977):

> There is no requirement ... that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants.... The application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self–recognized inability to meet the very standards challenged as being discriminatory.

*Id.* at 330, 97 S.Ct. at 2727. EEOC builds on this passage the following argument:

> Just as in *Dothard*, Greyhound's actual workforce excludes those persons who would be most affected by its policy. Self–selection will prevent blacks with severe cases of PFB from applying to Greyhound or from being hired or from asking to transfer to public–contact positions. In fact, but for its policy, Greyhound's workforce and applicant pool would be presumed to reflect the general population.... Accordingly, general population statistics are highly probative.

Appellee's brief at 19. In the abstract we might not fault this theory. In this case, however, it is simply irrelevant. EEOC did not present "general population statistics" to the district court. Instead, as we note in part II of this opinion, it was Greyhound that adduced statistical evidence showing that it has not discriminated against black males in its hiring practices. In the face of that proof, the question of "self–selection" becomes immaterial. In addition, as we point out in part III, EEOC's case was defective in that it introduced evidence only of the rate of PFB among blacks, without offering a comparison of the number of white males who are unable to shave because of skin conditions or diseases. The Commission's evidence thus was inadequate to prove disproportionate self–selection, just as it was inadequate to prove any disproportionate direct impact.

tenth circuit in *EEOC v. Navajo Refining Co.*, 593 F.2d 988 (10th Cir. 1979). The employer in that case required a high school diploma or GED equivalent and a minimum score on an aptitude test as prerequisites for entry–level employment. Fewer Spanish surnamed Americans (SSA's) than "Anglos" met these requirements, but Navajo used statistical adjustments to equalize the scores of the different groups. The district court enjoined use of the tests because they had a disparate impact, but the tenth circuit reversed because EEOC had not shown a disparity in actual employment. The evidence showed that SSA's made up 23.2 percent of the available workforce, thirty percent of Navajo's applicants, and thirty–eight percent of its new entry· level employees. The court recognized the disparity in the numbers of SSA's and Anglos who met Navajo's requirements before the adjustments, but it saw no need to consider that point in the absence of discrimination in fact in actual numbers hired. *Id.* at 991. Similarly, in this case we need not consider the alleged disparate impact of Greyhound's no–beard policy because there was no actual discrimination or disparity in its hiring. EEOC argues that *Navajo Refining* was wrongly decided. We disagree. "[N]onvalidated tests and subjective hiring procedures are not violative of Title VII *per se.* Title VII comes into play only when such practices result in discrimination." *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1381 (5th Cir. 1974), *quoted in Navajo Refining*, 593 F.2d at 991.

### III.

■ There is an additional reason, however, why this EEOC action must fail. Even if the evidence had shown that Greyhound employed proportionately fewer blacks than whites at its Philadelphia terminal, this would not make out a prima facie case of racial discrimination. To establish a prima facie case of employment discrimination under the disparate impact theory, the plaintiff must demonstrate a causal connection between the challenged policy or regulation and a racially unequal result. In other words, a policy does not have a disparate impact unless it is the cause of that impact. In this case the Commission has not demonstrated that Greyhound's no–beard policy has a greater impact on blacks than on whites. EEOC argues that "[b]ecause of PFB's overwhelmingly greater prevalence among blacks than among other racial groups," Greyhound's policy "perforce excludes disproportionately more blacks than whites from its public–contact positions." Appellee's brief at 13–14. EEOC's evidence, however, assuming that it was reliable, admissible, and probative, would support only a conclusion that PFB has a disproportionate impact on blacks. It has presented *no evidence from which it logically may be inferred that Greyhound's policy has a disproportionate impact.*

The Commission presented statistical data relating to the incidence of PFB among young black males. It relied heavily on the expert testimony of Dr. A. Melvin Alexander, whose actual research consisted of examining only fifty black males admitted to a United States military hospital in Okinawa. He was permitted to refer also to two other studies which, like his, were limited to young black men, shaving beginners, either in the Army or in college.[6] Based on a self devised gradation scale he testified that in his opinion approximately one·half of those suffering from the condi-

---

6. Dr. Alexander reported the results of a study conducted by Dr. Surinder Arora at Howard University, reporting that he found a PFB prevalence of 55 percent among 234 black males. Assuming the admissibility of this evidence, its probative value is minimal. That study did not indicate the incidence of the degree of the disease which would make shaving extremely painful or burdensome. App. at I–99a. He also testified to a study of 106 black shavers performed by Drs. Gary J. Brauner and Kenneth L. Flandermeyer, Army dermatologists. Although their report suggested generally that PFB was present in 83 percent of all blacks who shaved, 37 percent of their subjects showed no PFB papules (the condition making shaving uncomfortable), 16 percent showed some, and 47 percent showed moderate to severe. Exh. P·41 at 65. The study did not include a specific indication of Dr. Alexander's self·styled Grade II, the extent of the condition requiring the growth of a beard.

tion, or, according to his own study, one-fourth of all blacks who shave, have a sufficiently severe case of PFB to be classified at least at "Grade II" and encounter moderate or serious shaving difficulty. On the basis of this evidence, EEOC concludes "that all PFB victims—or one-fourth of all blacks who shave—must grow beards to avoid aggravating their condition."[7] Appellee's brief at 20–21.

EEOC introduced evidence of the percentage of black males afflicted with PFB for the purpose of persuading the fact finder to draw the following inferences: (1) PFB victims are required to grow beards; (2) more black males would be eligible for public contact jobs if so many of them did not suffer from PFB; and (3) therefore, Greyhound's no–beard policy has a disproportionate impact on black males.

A legitimate or permissible inference must be deduced as a logical consequence of facts presented in evidence. *Bruce Lincoln–Mercury, Inc. v. Universal C.I.T. Credit Corp.*, 325 F.2d 2, 22 (3d Cir. 1963). There must be a logical and rational connection between the basic facts presented in evidence and the ultimate fact to be inferred. EEOC's evidence, relating to the incidence of PFB in black males, showed only that some black males are likely to grow beards because of this disease. It may be inferred from this that some black males would be eligible for public contact positions if they did not suffer from PFB. That is the *only* necessary or even permissible inference that can be drawn from this data. The evidence was insufficient to support the next inference, the ultimate fact essential to EEOC's case: that proportionately fewer blacks than whites were eligible for public contact positions and therefore that Greyhound's policy had a racially discriminatory impact. We cannot draw this inference because no evidence was introduced demonstrating that there is no skin condition or disease affecting white males—other than PFB–that makes shaving difficult or painful and requires them to grow beards. Without this evidence EEOC proved only that Ferguson was disadvantaged because he had PFB, not that he was disadvantaged because he was black.

The Commission has simply overlooked an important element of the decisions it cites. When the Supreme Court has found illegal discrimination on the basis of an employer's use of a test or physical requirement to screen applicants, it invariably has compared the impact of the test or qualification on the majority with its impact on the minority alleging discrimination. *See Dothard v. Rawlinson*, 433 U.S. 321, 329–30, 97 S.Ct. 2720, 2726–2727, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 & n.6, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). This case is analogous to *Dothard* and *Griggs*. To establish a prima facie case, EEOC was required to prove that Greyhound's policy had a greater impact on blacks than on whites. It has shown, at most, only that the policy weighed more heavily on individuals who have PFB than on those who do not. Without comparative statistics showing the percentage of white males who suffer from diseases or skin conditions that make shaving painful or impossible, EEOC's evidence that many black males are unable to shave because of PFB simply does not permit the inference of a disproportionate impact.

In sum, to establish a disparate impact case here, EEOC first had to present much more dermatological information, adequately covering both white and black males,

---

7. For the purpose of deciding this appeal, we assume that a study of fifty black American soldiers in Okinawa and 106 college students in Washington, D.C., is sufficiently respectable evidence to establish the physical conditions of 178,553 black males in Philadelphia; but we consider statistics from such a tiny universe tenuous at best. Similarly, we question whether evidence relating to the incidence of PFB in young black men who are beginning shavers is probative of its prevalence in the black male population as a whole. Cf. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) (simplistic percentage comparisons lacked real meaning in the context of the case; plaintiffs' proof was too fragmentary and speculative to support a serious charge in a judicial proceeding).

from a statistical universe large enough to be respectable, dealing with both PFB and all other skin conditions affecting black and white males in the applicant pool; and second, it had to show that enforcement of the policy resulted in actual discrimination in the employer's workforce.

The judgment of the district court will be reversed and the proceedings remanded with a direction to enter judgment in favor of the defendant.

SLOVITER, Circuit Judge, dissenting.

I.

In this Title VII case, the district court found that Jeffrey B. Ferguson, a black Greyhound employee, was discharged because of his failure to comply with Greyhound's "no beard" policy applicable to employees in public contact positions; that he was unable to comply with Greyhound's "no beard" policy because he had a severe case of pseudofolliculitis barbae (PFB); that this condition "is a skin disorder that primarily affects black males"; that the "no beard" policy has a discriminatory impact on black employees; that the EEOC established its prima facie case; and that Greyhound failed to establish its business necessity defense. The issue on appeal, therefore, is whether these findings can be affirmed under the "clearly erroneous" test which we are bound to follow. Fed.R.Civ.P. 52(a). Surely we must use no different standard and accord no less weight to the district court's findings that an employer has violated Title VII than we have used in affirming the district court's findings that an employer has not violated Title VII. *See Scott v. University of Delaware*, 601 F.2d 76, 81 (3d Cir.), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); *Whack v. Peabody & Wind Engineering Co.*, 595 F.2d 190, 193 (3d Cir. 1979) (per curiam); *Walton v. Eaton Corp.*, 563 F.2d 66, 74 & n.9 (3d Cir. 1977) (en banc).

The majority's holding that plaintiff in this case did not even establish a prima facie case of discrimination is inconsistent with our frequent representation that we

are not "overly demanding in the proof required for a *prima facie* [Title VII] case." *Jackson v. U.S. Steel Corp.*, 624 F.2d 436, 440–41 (3d Cir. 1980); *Whack v. Peabody & Wind Engineering Co.*, 595 F.2d at 193 n.11. Moreover, the new rules it enunciates unnecessarily restrict the disparate impact theory and may thereby hamper the effectiveness of such litigation as an enforcement mechanism under Title VII.

II.

Some additional detail regarding the nature of PFB may be useful to an understanding of the issues. As the district court explained, PFB

is caused by sharp tips of recently shaved facial hairs penetrating the skin and causing an inflammatory reaction. The disease occurs in persons with curly or kinky hair follicles. After shaving, the curved hair follicles cause the already curly hair to curve back into contact with the skin surface, pierce and reenter the skin, causing a pseudofollicle.

The inflammatory reaction may result in papules, pustules or abscesses. An individual with PFB may induce remission by growing a beard. Remission in such cases is nearly total and complete. An individual can, however, redevelop the disease by resuming shaving.

The court's finding that Ferguson was unable to comply with Greyhound's "no beard" policy is supported by evidence on the record that Ferguson began to develop PFB symptoms in 1976; that he tried chemical depilatories in both powder and cream form in order to avoid shaving while complying with the "no beard" policy, but the depilatories "burned" his face and aggravated his skin inflammations; that he tried alternative shaving techniques without success; and that he found the only effective method to avoid the condition was to abstain from shaving.

The court found that Ferguson was advised by his doctors to grow a beard as a curative and preventative measure. At Greyhound's instructions, Ferguson visited a free medical clinic where, after examina-

tion, Dr. Michael LeWitt diagnosed his condition as PFB and concluded that it was "medically indicated for Mr. Ferguson to retain his beard." Thereafter, Ferguson was examined by Greyhound's company doctor, Dr. Richard Baker, who noted Ferguson's scars, and wrote "shaving seems to produce abscesses . . . I hereby do allow him to grow a beard." Yet a third doctor, Dr. John Covington, also recommended after examining Ferguson that he avoid shaving. Nevertheless, Greyhound refused to make a medical exception for Ferguson so that he could be promoted to the public contact job for which he was qualified.

Based on the evidence introduced at trial, the court made the critical finding that the " 'no beard' policy, while racially neutral on the surface, in fact has a discriminatory impact on black employees. Black males who are otherwise qualified, are barred from higher paying positions solely because of a condition peculiar to their race."

Initially, some comment is required about the majority's reluctance to acknowledge that a policy against beards can constitute a Title VII violation. At 190, n.3. Its reluctance demonstrates the fundamental difference between my view and what appears to be the majority's view as to the scope and function of that statute. I assume, as have almost all of the judges who have previously considered the issue, that the purpose of Title VII, *inter alia*, was to prohibit practices and policies that have a discriminatory impact on members of one of the groups within its protection. If a "no beard" policy falls more heavily on blacks, it is no less within the ambit of Title VII than the requirement that an applicant have a diploma or pass a test, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), meet minimum height and weight standards, *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), or demonstrate certain lifting ability, *Mitchell v. Mid–Continent Spring Co.*, 583 F.2d 275 (6th Cir. 1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979). Any employment policy shown to fall more heavily on a protected group than on those not within the group

can be maintained, if at all, only if it is functionally related to the employment in question (an issue the majority does not reach). A "no beard" policy is to be treated no differently than any other employment policy, and indeed should be subjected to exacting inquiry since the skin condition it affects results from an immutable physical characteristic.

The majority, in the holding represented by Part II of the opinion, does not take issue with the underlying factual findings that PFB primarily affects black males, and that the "no beard" policy bars otherwise qualified black males from higher paying positions solely because of this condition. Instead it enunciates a concededly tautological rule, new to this court and without any support in the holdings or reasoning of any Supreme Court case, that "no violation of Title VII can be grounded on the disparate impact theory without proof that the questioned policy or practice has had a disproportionate impact *on the employer's workforce*." At 192 (emphasis added). The majority holds that the district court's finding of disparate impact cannot be sustained because "the percentage of black male employees to total male employees in jobs at the Philadelphia terminal covered by the no -beard policy has exceeded substantially the comparable percentage of black males in the labor force and in the general population in the Philadelphia Standard Metropolitan Statistical Area (SMSA)." At 191.

This deceptively subtle transformation of the disparate impact method of proving discrimination can have a devastatingly deleterious effect on enforcement of Title VII. Although the majority does not discuss the implications of its rule, it is apparent that it will mean that an employment policy which excludes applicants as a result of a race–linked characteristic will, nonetheless, not be considered to have a disparate impact upon members of that race if the percentage of that racial minority in the employer's workforce is equal to the percentage of that minority in the general population. This rule would establish by judicial fiat an

invidious quota defense since a black applicant, excluded solely because of inability to comply with the employment policy, will be deprived of his or her employment opportunity because the employer has already hired the required percentage of blacks.

The majority thus inverts the use of population statistics heretofore recognized in Title VII cases by treating the percentage of that minority in the labor force or in the general population as the outer limit to which an employer is obliged to extend its hiring. Population statistics have been considered relevant in Title VII cases because gross underrepresentation of minorities in the employer's workforce may reflect discrimination unless some other factor, such as unavailability of qualified minorities, can be shown to exist. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 n.20, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Dothard v. Rawlinson*, 433 U.S. at 329–30, 97 S.Ct. at 2726–2727. Even under the majority's view holding workforce percentages relevant in determining impact, it would be necessary, at a minimum, to consider whether, in the absence of the disputed policy, there might be an even higher percentage of black employees. It is more than likely that jobs at Greyhound and at other bus companies might have particular attraction to blacks who are still deprived of equal employment opportunities in certain other industries or who may still suffer from earlier educational deprivations in their quest for employment in certain other fields.

The majority's hypothesis, that proportionate representation of minorities in the employer's workforce negates a finding of discrimination, has been rejected in the one Supreme Court case to present a similar factual situation. In *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam), the Court considered an employer's policy of rejecting applications from women who had preschool–age children. Although the representation of females in the employer's relevant workforce (75–80% of the workforce) was higher than the percentage of female applicants (70–75% of applicants

were female), the Court held plaintiff had established a prima facie case under Title VII. Significantly, for our purpose, the Court did not use those statistics to negate discrimination but merely found the percentage of women in the employer's workforce to be relevant to show the absence of bias against women as such. *Id.* at 543, 91 S.Ct. at 497. Similarly, in this case, the EEOC does not contend that Greyhound adopted its "no beard" policy with the purpose or intent to discriminate against black employees. Although the percentage of black representation in the workforce may negate an intent to discriminate, it still cannot relieve an employer from the necessity of justifying adoption of a policy which falls more heavily on one race than on others.

The majority, I believe mistakenly, considers impact by focusing on statistics of the employer's workforce. Title VII creates a right to an individual not to be subjected to practices that disqualify members of the protected groups at a disproportionate rate. It protects members of minorities knocking at the door to come in or to move up. For them, it is immaterial that others of their group are already there. Title VII's valuable contribution to a more just society is its promise of equal opportunity of employment without regard to race, sex, religion, or national origin. It is that opportunity which Ferguson was denied by Greyhound's "no beard" policy.

The majority's rule would completely ignore the effect of the employer's policy on the individual members of the minority group who will be adversely affected in their opportunity for employment or promotion. The language of the Supreme Court, acknowledged but disregarded by the majority, in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), is directly on point: "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, *without regard to whether members of the applicant's race are already proportionately represented in the work force.*"

*Id.* at 579, 98 S.Ct. at 2950 (emphasis of "each" in original, remainder of emphasis added). The majority's attempt to distinguish *Furnco* on the ground it was a case of disparate treatment rather than disparate impact is makeshift; these are alternative methods of proving discrimination under Title VII. The employer's basic obligation not to discriminate does not change because the discrimination is accomplished by a facially neutral policy instead of by intentional discriminatory treatment. We cannot allow so basic a public policy to be undermined by such a facile distinction.

The Fifth Circuit decisively rejected a similar attempt by an employer to contrive a new defense to Title VII based on its employment statistics. In *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974), plaintiff challenged the employer's requirement of a diploma and of passing a standardized test which disqualified black applicants at more than three times the rate for white applicants. In rejecting the employer's suggestion that workforce statistics showing that blacks were employed at a rate equivalent to the percentage of the general population constituted a defense, the court stated that such statistics were irrelevant since they did not negate the effect of a specific hiring practice that disqualified blacks at a disproportionately high rate:

> [The employer's] reliance on such data misinterprets the significance of Johnson's proof. Such evidence does not disprove the essential finding that the tests have a detrimental impact on black applicants. It merely discloses that Goodyear has attempted by other practices to remove the taint of the tests' consequences. The fact still remains that for those potential black hires and black labor department transferors, these unvalidated testing devices have a substantial invidious effect.

*Id.* at 1372–73 (footnote omitted).

In light of the history of Title VII as interpreted by the Court ("the basic policy of [Title VII] requires that we focus on fairness to individuals rather than fairness to classes." *City of Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 709, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657 (1978)), I would hold the Fifth Circuit's approach much more persuasive than that of the Tenth Circuit in *EEOC v. Navajo Refining Co.*, 593 F.2d 988 (10th Cir. 1979), which the majority has chosen to follow.

### III.

In Part III of its opinion, the majority has fashioned yet another rule that will further erode the discriminatory impact method of proving discrimination. Without citation of any authority, it now proclaims that, "To establish a prima facie case of employment discrimination under the disparate impact theory, the plaintiff must demonstrate a causal connection between the challenged policy or regulation and a racially unequal result. In other words, a policy does not have a disparate impact unless it is the cause of that impact." At 193. The majority's imposition of the requirement of showing causation may, at first reading, appear as appropriate in a Title VII case as in a negligence case. However, it must be stressed that such a requirement has not previously been imposed in Title VII cases because it would impose on Title VII plaintiffs the almost insurmountable burden of proving what would have happened in a hypothetical factual situation.

One may interpret the requirement of showing causation articulated by the majority as necessitating proof that the minority population within the employer's workforce would have been higher but for the challenged employment policy. But a Title VII plaintiff, such as an unsuccessful applicant, has never previously been required to show that s/he would have been hired but for the discrimination. In fact, in disparate treatment cases, the now accepted mode of proof includes no such requirement, permitting a prima facie case to be established merely by plaintiff's proof that s/he is a member of the protected group, was qualified for the job, was rejected, and that the position remained open. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). There is no justifica-

tion for any higher requirement of causation in disparate impact cases than in disparate treatment cases.

One of the difficulties which plaintiffs will face if the majority's causation rule is accepted can be seen in considering how a plaintiff could successfully meet this new burden. Presumably, employers will claim, as they have in the past, that the minority representation in the workforce is low because there were no or an insufficient number of minority applicants who satisfied the employment policy. Although this may be a legitimate *defense*, the majority's new causation requirement would convert the converse into part of plaintiff's prima facie case. Now, the employer will argue, it is *plaintiff* who must show that there were actual minority applicants (and their number or proportion) who were disqualified. This burden must be met because, the argument will continue, without such evidence plaintiff has not established the required causal nexus between the challenged policy and the impact on the workforce. Yet this is precisely the evidence which the Supreme Court has held would not be required of a Title VII plaintiff.

In *Dothard v. Rawlinson*, 433 U.S. at 330, 97 S.Ct. at 2727, the Court held that generalized national statistics showing that the statutory weight and height requirements would exclude proportionately more women than men were sufficient to establish a prima facie case; it specifically rejected the employer's contention that a statistical showing of disproportionate impact must be based on analysis of the characteristics of actual applicants. The Court refused to impose on Title VII plaintiffs the difficult evidentiary burden regarding actual applicants in part because the Court recognized that the actual applicant pool might not adequately reflect the full number of persons affected by the policy. Others, unnamed and unknown, may have been dissuaded from ever applying. *Id.* The Supreme Court's decision in *Dothard* is difficult to reconcile with the majority's causation rule since data regarding actual applicants, deemed unnecessary by the Supreme Court, would, under the majority's rule, be needed to show the cause of the disparate result.

## IV.

The majority's application of its causation requirement in this case is illustrative of the nature of the high burden it places on Title VII plaintiffs. Here, the majority is unwilling to label as "clearly erroneous" the district court's findings that PFB is a disorder which predominantly affects blacks, that it "overwhelmingly affects black men who shave" and that it is an immutable characteristic peculiar to members of the black race.[1] It nonetheless finds that plaintiff has not established its prima facie case because plaintiff failed to negate the possibility that non–blacks, although rarely affected by PFB, may nonetheless be affected by some hypothetical, unknown, and unnamed skin disorder in the same high proportion as PFB affects blacks. Although a more pointless burden would be difficult to imagine,[2] plaintiff's experts did testify, without objection by defendant, about an article in the medical literature to the effect that blacks tend to be more prone to the difficulties associated with shaving from skin disorders than non–blacks.[3]

More significantly, no case has been called to our attention requiring a Title VII plaintiff to disprove the existence of a com-

1. Dr. Alexander, a dermatologist conceded by defendant to be an expert on PFB, testified that PFB is overwhelmingly a problem of blacks. In the course of his practice he encountered only one white person with PFB.

2. The higher number of advertisements directed at the black community relating to ways to alleviate skin disorders caused by shaving and to shaving devices which may tend to minimize skin disorders suggests the significance of the problem to blacks. One can assume that comparable advertisements would be directed to the white community if there were comparable problems.

3. The article to which Dr. Alexander referred was "Shaving/A Cause of Skin Disorders" written by Dr. Gibson E. Craig which appeared in "Clinical Symposia". The district court refused to permit this article, as well as other articles referred to by Dr. Alexander, to be introduced in evidence as exhibits, holding that Fed.R.Evid. 803(18) only permitted the expert witness to read the relevant portions of the articles into the record.

parable impact on whites *from some other cause* which might equalize the adverse impact on the protected class. Indeed, the majority does not even remand the case to the district court to permit reopening of this non–jury trial so that plaintiff may attempt to produce evidence to meet the heretofore unknown burden which the majority imposes on it.[4] Instead it directs entry of judgment in favor of the defendant.

Perhaps the effect of the majority's new rule can be understood best by applying it in a hypothetical situation. If an employer were to disqualify all applicants with sickle–cell trait, I assume we would agree that evidence that approximately 10% of all blacks but almost no whites have that trait suffices to establish plaintiff's prima facie case under the disparate impact theory. If, however, the employer frames its policy to exclude all applicants with a potential blood disorder, and plaintiff produces the same evidence, the majority's rule would compel a holding that plaintiff has not established a prima facie case unless it also produces evidence negating the possibility that whites have other potential blood disorders that cumulatively affect 10% of the white population.

In my view, the evidence introduced by plaintiff in this case was sufficient to support the finding that plaintiff established a prima facie case under Title VII because the evidence showed (1) that Ferguson has a condition which disproportionately affects a protected class of which he is a member; and (2) that this condition precludes him from meeting the employer's facially neutral employment policy. He need not make the additional showing that there is no condition affecting whites which poses a similar obstacle to employment under the challenged policy. Of course, Greyhound had the opportunity to show that its policy does not in fact disproportionately affect blacks by demonstrating that other conditions preclude a like percentage of whites from meeting the employment requirement, but

it did not do so. In other words, plaintiff's statistics showing that PFB predominantly affects blacks were sufficient to permit the district court to draw the inference that the "no beard" policy predominantly affects blacks. Greyhound was free to challenge this inference by showing that the "no beard" policy has an equal effect on whites. In *Dothard*, the Court made a similar observation:

> The plaintiffs in a case such as this are not required to exhaust every possible source of evidence, if the evidence actually presented on its face conspicuously demonstrates a job requirement's grossly discriminatory impact. If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own.

433 U.S. at 331, 97 S.Ct. at 2727.

Because I am concerned that the majority's opinion imposes unwarranted obstacles to the effective use of the discriminatory impact method of proving a Title VII case, I dissent.

---

4. It would not impose a great burden on Greyhound to permit beards to be worn by those employees who can show medical justification. The EEOC produced evidence showing that

both the District of Columbia Police Department and the United States Army permit beards to be worn on appropriate medical documentation.