Alvin McCANN

v.

**DELAWARE RIVER PORT AUTHORITY.**

**Civ. A. No. 81–4678.**

United States District Court, E.D. Pennsylvania.

Oct. 13, 1982.

1207

Mark B. Frost, Philadelphia, Pa., for plaintiff.

D. Donald Jamieson, Laurence Berk, Jeffrey Cooper and Catherine Votaw, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for defendant.

## MEMORANDUM

GILES, District Judge.

This is an employment discrimination case in which plaintiff, a black male, claims that his discharge was based upon considerations of race in violation of Title VII of the Civil Rights Act of 1964, as amended, ("the Act"), 42 U.S.C. § 2000e *et seq.* (1976). For the reasons which follow, judgment shall be entered in favor of defendant and against plaintiff. Pursuant to Fed.R.Civ.P. 52(a), the following constitute the court's findings of fact and conclusions of law.

1. Plaintiff began working for the Delaware River Port Authority ("DRPA") on April 25, 1976 as a highway helper on the Betsy Ross Bridge, one of six bridges under the jurisdiction of the DRPA, forming traffic links between the Commonwealth of Pennsylvania and the State of New Jersey.

2. As a member of the black race, plaintiff is a member of a group protected under the Act.

3. Defendant is an employer within the meaning of the Act.

4. Plaintiff was a member of a collective bargaining unit represented by Transport Workers' Union in a collective bargaining agreement with the employer dated November 1, 1977.

5. Plaintiff was terminated from employment on September 7, 1979, the assigned reason being excessive use of sick leave in violation of the terms of a collective bargaining agreement between DRPA and the union.

6. On December 6, 1979, plaintiff filed a timely charge of employment discrimination with the Equal Employment Opportunity

Commission pertaining to his discharge on December 6, 1979 and received a "Right to Sue Letter" on September 1, 1981.

7. With respect to sick leave, the union agreement provides, in pertinent part:

All permanent TWU-represented employees of the DRPA are entitled to Sick Leave time at the rate of fifteen (15) days per calendar year. There is a maximum of 200 days an employee may accumulate; however, reimbursement at the time of separation will be made on a maximum of 180 days. Employees will use Sick Leave credited in the current year before using any Sick Leave previously accumulated. Employees will normally accumulate all Sick Leave days not used in a given year, adding these to the previous total of accumulated and unused Sick Leave days, if any.

\* \* \* \* \* \*

When an employee is ill and unable to report to work, his or her immediate supervisor should be advised of this fact on or before the normal starting time. Employees on shift work shall give notice at least one hour before their scheduled starting time to permit rearrangement of schedules.

\* \* \* \* \* \*

A doctor's certificate is not normally required for illness causing absence for two (2) consecutive working days or less. A certificate is normally required for illness resulting in absence of more than two (2) consecutive working days. (Note: Sick Leave absence separated by a day off or days off for any reason is considered absence on consecutive work days.) The doctor's certificate must be presented to the employee's supervisor upon return to work.

8. The sick leave provision was negotiated upon demand by the union that the defendant institute a uniform system for monitoring absenteeism. The collective bargaining agreement does not specify how the absentee policy is to be administered.

9. Commencing approximately January, 1978, defendant's Maintenance Manager started a practice of monitoring absenteeism by obtaining a quarterly computer read-out listing all employees whose absenteeism exceeded the number of sick leave hours which were being earned and accrued under the labor agreement. Based on this information, the Maintenance Manager would ask the department supervisors the explanations, if any, for absences of employees whose sick leave appeared to be excessive. If no satisfactory explanation was given, that is, prolonged illness or accident requiring prolonged absence, the employee would be subject to progressive discipline such as warning letters, suspension and discharge.

10. Beginning around March, 1977, plaintiff experienced ear infections which he believed were related to periodic spells of vertigo and dizziness. At times, these spells disabled him from performing his normal work duties as a general maintenance worker.

11. Plaintiff complained to his department supervisor, Joseph Reiners, about his symptoms and related them to the noisy outdoor power equipment on or about which he sometimes worked. However, no physician ever rendered an opinion that the condition of which he complained was work related.

12. Plaintiff's health difficulties were acute, not chronic, but persisted into 1978 and thereafter. As a result of his ear problems and the associated vertigo and dizziness, plaintiff was absent from work, usually for a day or two at a time. Upon his return to work he sometimes, but not always, submitted a physician's statement. The medical certifications did not always explain the reasons for the absence.

13. The doctor's notes submitted by plaintiff were as follows: *6/8/76*—"Patient under doctor's care. May return to work 6/10/76"; *8/30/76*—"Patient under doctor's care for viral infection. May return to work 9/1/76"; *3/28/77*—"May return to work 3/30/77—Nemin's syndrome"; *6/7/78* —(illegible, but it appears to state that patient had vertigo and loss of balance and was being referred for further evaluation);

*6/23/78*—"Under doctor's care for ear problems and vertigo. Return to work 6/26/78"; *8/2/78*—"Was seen in our office 8/2/78. May return to work 8/3/78"; *10/18/78*—"Under doctor's care for URI. May return to work 10/20/78"; *1/26/79*—"Above named under doctor's care for Upper Respiratory Inf." Return to work 1/29/79"; *3/2/79*—"Treated at WJ Hospital 2/28/79 for ear infection and hearing loss. Under doctor's care 3/2/79 to 3/5/79. Return to work 3/5/79"; *7/23/79*—"[U]nder my care from 7/23 and is able to return to work 7/24/79. Follow up on condition."

All of the certificates are from the same physician's group.

14. After each absence, plaintiff was certified by his doctor as able to return to his normal duties.

15. A number of the absences coincided with weekends.

16. As a result of plaintiff's absences in 1977, he exceeded the fifteen (15) days accruable for sick leave annually. Thereafter, he was marked as absent.

17. Unused sick leave time accumulates from year to year. Employees who exhaust their accumulated sick leave hours are marked absent though legitimately ill and are subject to discipline for excessive absenteeism, unless the absences are excused. However, employees whose absences for illness do not exceed accumulated sick leave time can not be disciplined unless there is an abuse of sick leave.

18. Plaintiff asserts that he was the victim of disparate treatment because his recurring ear condition was not regarded by defendant as a chronic medical condition. He was subjected to disciplinary action, whereas, defendant found that certain white employees, who had sustained off duty injuries or illnesses had chronic medical conditions which did not warrant disciplinary action.

19. Defendant reasonably believed that plaintiff's condition was not a chronic or prolonged illness. None of plaintiff's treating physicians rendered such an opinion, his sick leave absences were intermittent, were not all ear related and were not always supported by physicians statements.

Plaintiff has failed to show by a preponderance of the evidence that defendant's failure to treat his ear related problems as chronic was based upon his race.

20. Unlike many other employees, plaintiff did not have accumulated sick leave time as of August 1979 because he began using sick leave days at a high rate shortly after he began working.

21. On July 12, 1978 and October 5, 1978, plaintiff received warning notices advising him that he was using sick leave in excess of the rate at which it was being accrued, *i.e.*, fifteen days a year. The notices stated that the company was unaware of any chronic illness or injury that would justify absence for a prolonged time.

22. According to the documents produced at trial, in 1977, plaintiff started the year with 19¼ days of sick leave, which was exhausted by April of that year. He had no accumulated sick leave to carry over into 1978. By June 23, 1978, he had exhausted the fifteen days allotted for that year and was marked absent for an additional eleven days of sick time by the end of the year. His illnesses were sporadic throughout the year. In 1979 he exhausted the allotted fifteen days by July 17, 1979 and was marked absent for an additional 6¼ days. His absences also were sporadic during that year.

23. On January 15, 1979, plaintiff was suspended for two days for a continued pattern of excessive absenteeism. This suspension notice also apprised plaintiff that the defendant was unaware of any chronic health problem which might justify his absentee record. Plaintiff did not contest the suspension during his employment.

24. Plaintiff was the first employee suspended or discharged during the relevant time period for absenteeism. However, prior to plaintiff's discharge, other employees received warning letters concerning possible excessive use of sick leave.

25. Defendant had a reasonable basis for concluding that plaintiff had the worst absenteeism record among its employees. The issuance of the warning notices to him and the suspension were consistent with its policy of progressive discipline for absenteeism. Defendant's actions did not evidence disparate treatment in comparison to white employees' use of sick leave.

26. A review of the sick leave absenteeism records of white employees submitted at the trial shows the following:

(a) James Walsh was sick seventeen days in 1978 and received two warning letters. His absences in 1979 were all related to severe injuries sustained in a fire in his home. At the beginning of 1977 he had 66 accumulated days of sick leave and used fourteen days sick leave. In 1978, he started with 64½ accumulated days.

(b) In 1978 Charles Bluhm used fifteen days and was not charged as absent. His absences reflect a period of continuous chronic illness related to serious stomach problems. He received warning letters on October 5, 1978 and January 15, 1979, related to the 1978 absences. He was absent only twice in 1979. In 1980 he used ten and one/half days of sick leave.

(c) Allan Wickizer used only twelve days in 1978 and fourteen days in 1979. For the first six months of 1980 he was absent nine days and received a warning letter on August 20, 1980.

(d) Ronald Holak used one day in 1977 and three days in 1978. In 1979 he used twenty-five of sixty-three accumulated days. Most of the time was taken during the same period. He had a gall bladder condition requiring surgery. In 1980 he used three and one/half days of sick leave.

(e) Sante DiPietroandonio used no sick leave days in 1978 and only four in 1979.

(f) Peter Aruanno used twenty-six of 116 accumulated days of sick leave in a nine month period. He received a warning letter on October 5, 1978. The trial exhibits are insufficient for a determination of whether his attendance improved for the remainder of 1978 or 1979.

(g) Joseph Vena did not exceed his fifteen allotted sick leave days in either 1977, 1978, 1979 or 1980.

(h) Leonard McDevitt received two warning letters in 1978. During the first nine months he used fifteen days of sick leave and was marked absent for four additional days. On February 4, 1980, he received a further warning letter because he used fifteen days in that year. In 1980 he used thirteen days.

(i) In 1977, Winslow Bender used nine sick leave days and six days in 1979.

(j) In 1978 David Mannino used eight and one/half sick leave days and in 1979, seven and one/half days.

(k) Bruce Henderson used fifteen days in 1978. He received warning letters on April 10, 1978 when he had used approximately six days and on July 12, 1978 when he had used approximately thirteen days. In 1979 he used sixteen and one/half days and received a warning notice dated February 4, 1980. He never exceeded the combination of his accrued and accumulated sick leave time.

(*l*) The attendance record of Vincent Marra, Assistant Foreman, Grounds, cannot be used as a comparison with plaintiff's, since Marra is a supervisor and not subject to the collective bargaining agreement. However, all his sick days in 1978 and 1979 were related to severe injuries sustained as a result of a fall from a roof while off duty.

(m) The sick leave records submitted at trial by plaintiff are insufficient for analytical purposes as to Philip Giorando, Walter Freer and Dominick Mazzarella. Each did receive a warning letter for absenteeism.

27. Since plaintiff's discharge, one other employee, Anthony Corrato, a white male, was terminated for violation of the sick leave policy. In 1978, Corrato used ten of the fifteen allotted sick days and had a carry-over into 1979 of five days. However, he was charged with 101 days absent in 1978 because he and the company had a dispute as to whether a work related injury which was the subject of a workmen's compensation claim had ceased as of Septem-

ber, 1978. Defendant could not terminate Corrato because there was a pending workmen's compensation claim, which if adjudicated in his favor, would have excused his absences. He was discharged on July 15, 1980 because, though he was certified by his doctor as fit to return to limited duty, he did not deliver the letter to the company until many days after the date of the physician's statement.

28. As of the date of plaintiff's discharge on September 7, 1979, Corrato and plaintiff were the only employees who had exhausted their sick leave time, and were therefore marked absent.

29. Plaintiff had been marked absent due to illness on July 17, had worked the next day and was absent six hours on Thursday, July 19, and all day Friday, July 20 and Monday, July 23. He visited his doctor on July 23rd and returned to work on Tuesday, July 24 with a physician's statement that merely stated that he had had a "follow-up on condition." For the remainder of that week and the following week, plaintiff worked without absence.

30. Off-duty, on the evening of August 2, 1979, plaintiff was involved in an automobile accident which rendered him unable to report to his normal duties.

31. On August 3, 1979, plaintiff reported to work but advised his immediate supervisor, a vacation replacement for department supervisor Reiners, that due to the accident he did not believe he could perform the physical requirements of his regular duties. He stated he would attempt to do any available light work. None was available so he was sent home.

32. Plaintiff contends that the failure of defendant to assign him light work on August 3, 1982 was discriminatory in that white employees have been given light duty assignments when they were physically unable to do any work. The preponderance of the evidence is against this contention. The work assignment sheets produced by defendant at trial showed blacks were not assigned disproportionately to less desirable work.

33. Defendant had a practice of assigning employees with injuries to light duty if it existed and could be performed by the employee. Here, there was no light duty work which the plaintiff could perform. On August 3, 1979, plaintiff had non-specific complaints about physical conditions which were undiagnosed. It was reasonable for an employer under such circumstances to refuse to assign an employee to any work which might exacerbate the off-duty injuries or in some way cause the off-duty injury to be attributed to the workplace.

34. Plaintiff has not carried its burden of showing that the non-assignment of light work was a pretext for race discrimination. Plaintiff in the past had been the beneficiary of light duty assignments when he complained to Reiners about his ear condition.

35. I credit plaintiff's testimony that he telephoned on a daily basis to report that he was unable to work due to a painful condition resulting from the accident. However, I find that plaintiff never apprised his supervisor of the specifics of his injuries. There was no mechanism in place for the line supervisory personnel to report to upper management that an employee had called to report an absence.

36. Plaintiff did not appreciate the full extent of his accident related injuries until he visited a physician on August 13, 1979. His condition was diagnosed as acute sprain and strain of the cervical spine and a first degree separation of the left shoulder.

37. Plaintiff's absence came to the attention of Maintenance Manager Morrison in August. He was made aware of plaintiff's accident and sent supervisors to plaintiff's home on August 15 and September 5. On neither occasion was plaintiff home. According to plaintiff, he was at his attorney's office relative to the automobile accident claim. On August 16, 1979, plaintiff called the employer and spoke to assistant foreman Vincent Manuso and explained that his absence from home on the previous day was due to a visit to his attorney's office.

38. After August 3, 1979, plaintiff submitted no medical documentation of his injuries to defendant. The employer, through its own investigation of plaintiff's file, learned that plaintiff was treated on the night of August 2, 1979 at local hospital and released after a diagnosis of contusions. The hospital report showed that x-rays were negative for fracture of the skull and ribs. Therefore, the only information the employer had as of August 15, 1979 were plaintiff's representations that he felt unable to work, and the knowledge that he was ambulatory.

39. Defendant sent supervisory personnel to plaintiff's home to observe whether he was malingering and to advise him that he was being considered for termination. Sending supervisory personnel to visit an employee reporting as sick was a common practice of the employer and was applied to black and white employees.

40. Around August 15, defendant gained some hearsay information through plaintiff's negligence attorney that plaintiff was physically unable to work. Plaintiff also learned through his attorney that he was subject to discharge. Yet, no medical report was submitted to the employer to explain plaintiff's claim of inability to work.

41. Defendant did not make a firm decision to terminate plaintiff until after September 5, 1979 when a supervisory visit to his home revealed he was not there.

42. On September 6, 1979, Robert Morrison, Manager of Maintenance, recommended to A.L. Griebling, Director of the Bridge Division, that plaintiff be terminated because, apart from the absences due to the auto accident, he had abused the sick leave policy, having exhausted his sick leave days for the year as of July 17. In addition, he had been absent without excuse 50¼ hours thereafter, and his 1979 record was similar in pattern—he exhausted his sick days by mid-year and was absent 11 days thereafter. Plaintiff had also reported late for work seven times between January and July.

43. Griebling concurred in Morrison's recommendation that plaintiff's record for absenteeism for the first seven months of 1979 was unsatisfactory even if considered for the entire year. On that basis, he, in turn, recommended dismissal to William W. Watkins, Jr., defendant's Executive Director, who executed the termination letter of September 7, 1979.

44. Plaintiff has not shown any evidence that racial animus on the part of either Morrison, Griebling or Watkins, was instrumental in the discharge decision.

45. Plaintiff's seven latenesses during 1979 were taken into account in effectuating his discharge. One of plaintiff's contentions is that he observed some white employees on the groundskeeping crew who were late for work and who were not recorded as late. Black employees who were late in reporting, however, were always logged in as late. The testimony in support of this contention of disparate treatment is not specific as to the names of these employees or dates involved. Plaintiff's observations are pitted against the assertions of defendant, through Joseph Reiners, that it had a routine procedure and practice of recording the latenesses of all employees regardless of race. Moreover, plaintiff does not deny that he was, in fact, late. I find that plaintiff's proof fails to make out a prima facie case of race discrimination. The observations of apparent preferential treatment do not exclude the possibility that there were excused latenesses for legitimate reasons, such as doctor's appointments in workmen's compensation cases, the permitted use of accrued sick leave, vacation leave, administrative leave, job incurred disability leave, funeral leave and jury duty.

46. Plaintiff contends that his discharge was tainted in some way by the fact that Vincent Marra, assistant foreman, used the word "boy" (in reference to plaintiff or blacks in general) when giving work instructions, which plaintiff considered racially derogatory. The same assistant foreman also often stated that he was proud to have been birthed by a "nigger doctor." Mancuso, assistant foreman, allegedly once told a racial joke to a mixed audience of blacks

and whites, but apologized to Mr. Perry when he objected and the joke was never retold. Plaintiff attributes no racial animus to his department supervisor, Joseph Reiners, and the evidence does not show preferential treatment of white employees by Reiners in job assignments or other job action.

With respect to his discharge, neither Marra, Mancuso nor Reiners made a recommendation or was asked by Morrison to do so. Although both visited McCann's home at Morrison's direction, there is no contention that either misrepresented what transpired.

The only other possible connection either Marra or Mancuso had with the discharge action, is that one or both received calls from plaintiff in August stating that he was unable to report to work because of the accident and deliberately failed to report this fact to Morrison. However, I find that, if asked, they would have reported any calls from plaintiff to Morrison. In any event, Morrison had become aware of plaintiff's accident and his contention that he could not report for work because of it. Therefore, the failure to report the calls, if that occurred, was not the proximate cause of the discharge action by Morrison.

I find that Morrison was motivated to recommend discharge because of the two occasions when he sent supervisors to plaintiff's home only to find the plaintiff not present.

47. To prove an employment discrimina-cause for the termination of an employee with a poor attendance record and did not intend to discriminate against plaintiff because of his race.

### DISCUSSION

 To prove an employment discrimination case under Title VII, plaintiff must initially establish, by a preponderance of the evidence, a prima facie case of discrimination. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court identified four factors required to establish a prima facie case in a

refusal to hire case. In such a case, plaintiff must prove:

(i) that he belongs to a racial minority; (ii) that he applied for and was qualified for a job for which the employer was seeking applicants; (iii) that despite his qualifications he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek applications from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824.

In *McDonnell,* the court also cautioned that "the facts necessarily will vary in Title VII cases, and the specification above [of the prima facie case] is not necessarily applicable in every respect to differing situations." *Id.* at 802 n.13, 93 S.Ct. at 1824 n.13.

Thus, courts have applied a modified version of the *McDonnell* criteria in cases such as this involving alleged discriminatory discharge. The formation of the prima facie case varies somewhat from Circuit to Circuit. *See, e.g., Boner v. Board of Commissioners of Little Rock,* 674 F.2d 693, 696 (8th Cir. 1982) (prima facie case established if plaintiff (1) was a member of a protected class, (2) was capable of performing the job, and (3) was discharged from the job); *Jackson v. City of Killeen,* 654 F.2d 1181, 1183–84 (5th Cir. 1981) (plaintiff must be (1) member of protected class (2) qualified for his job (3) discharged and (4) replaced with non-minorities, although the final criteria is not necessary in all cases); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir. 1977) (prima facie case established if plaintiff is (1) member of racial minority (2) was qualified for his job (3) was satisfying its normal requirements (4) was discharged (5) after discharge the same work was assigned to whites). *Cf. Anderson v. Savage Laboratories, Inc.,* 675 F.2d 1221, 1224 (11th Cir. 1982) (age discrimination—plaintiff must be member of protected group who was qualified for the job and then discharged and replaced by person outside protected group).

In this circuit, it appears that plaintiff's prima facie case will be met if he establishes that (1) he is a member of a protected class, (2) that he was qualified for the job he was performing, (3) that he was satisfying the normal requirements of the job, and (4) that he was the object of adverse action. *Whack v. Peabody & Wind Engineering Co.,* 452 F.Supp. 1369, 1371 (E.D.Pa.1978), *aff'd, per curiam,* 595 F.2d 190 (3d Cir. 1979). *See also McClain v. Mack Trucks, Inc.,* 532 F.Supp. 486, 489 (E.D.Pa.1982). *Cf. Leftwich v. United States Steel Corp.,* 470 F.Supp. 758, 764 (W.D.Pa.1979) (plaintiff must establish that (1) he is a member of protected class, (2) he was object of adverse employment action, and (3) causal connection between the two).

The burden of proving discrimination remains the plaintiff's throughout the trial. However, that burden is not "onerous" and is calculated to give rise to an inference of unlawful discrimination by eliminating the most common non-discriminatory reasons for the adverse action. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

Once the plaintiff establishes a prima facie case, the burden of going forward shifts to defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the employment action. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *McDonnell,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25. The defendant does not have to prove that it was actually motivated by the proffered reasons, but must clearly set forth its reasons for the adverse action. *Id.* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. Thereafter, plaintiff has the burden of producing evidence that establishes by a preponderance standard that the reason advanced by the employer is a pretext for discrimination. *Id.* at 256, 101 S.Ct. at 1095. In a disparate treatment case, which this is, the plaintiff has the burden of showing not only disparate treatment, but that such treatment was caused by purposeful or intentional discrimination. *Smithers v. Bailar,* 629 F.2d 892 (3d Cir. 1980).

Plaintiff made out his prima facie case. He established that he was black and discharged while on a prolonged absence due to an off-duty accident. In addition, there were some white employees who had had prolonged absences and were not discharged. The employer's evidence rebutted the presumption of discrimination in that the white employees' records produced at trial show either that they were not absent as plaintiff claims, or had prolonged absences caused by single off-duty accidents or chronic illnesses and had not exhausted their sick leave time. Other white employees received disciplinary warning letters after which their attendance records improved or, in the case of one employee, Corrota, were terminated from employment. Defendant's evidence also showed the existence of a sick leave policy since early 1978 which was administered by questioning all sick leave absences exceeding the rate at which days were being earned in the year in question, whether or not the employee had accumulated sick leave time. Finally, defendant produced evidence showing that plaintiff was justifiably terminated because of his absentee record for the first seven months of 1979. Plaintiff failed to establish that the termination action was undertaken with the intent to discriminate against him on the basis of his race as opposed to an aggressive effort on the part of defendant to monitor the sick leave provisions of the labor agreement. The racial slurs by several of plaintiff's immediate foremen played no part in the employment actions; those foremen neither had an effective input into the decision nor were consulted for their opinion on the matter. In any event, "while a pattern or practice of harassment directed at a single employee can violate Title VII, casual or isolated manifestations of a discriminatory environment, such as a few racial or ethnic slurs, may not raise a cause of action." *Bundy v. Jackson,* 641 F.2d 934, 943 n.9 (D.C.Cir.1981) (sex discrimination). Plaintiff's claim of disparate treatment in job assignments fails because the assignment records kept by

plaintiff's supervisor, Reiners, to whom no racial slurs or animus is attributed, established that plaintiff and other black employees were given the same kind of work assignments as white employees. The less desirable work was not assigned to blacks more frequently than to whites. The termination letter stated that plaintiff had also been marked absent at various times. He was absent as noted. The lateness reporting system was not shown to have been racially discriminatory, thus it cannot be said that race played any part in the termination action.

### Conclusions

1. This court has jurisdiction over the parties and subject matter of this action under the Act.

2. Plaintiff is an employee and defendant is an employer within the Act.

3. Plaintiff made out a prima facie case that his termination was based upon race because he testified that he was absent due to a prolonged illness then discharged while white employees in similar circumstances had not been similarly disciplined.

4. Defendant articulated a reasonable, non-discriminatory reason for the discharge and the treatment of other employees.

5. Plaintiff failed to prove thereafter that the reason advanced by the employer was a pretext for race discrimination.

Accordingly, judgment shall be entered in favor of defendant and against plaintiff.