**Francis B. PAYNE**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services.**

**Civ. A. No. 82–1516.**

United States District Court,
E.D. Pennsylvania.

Jan. 9, 1985.

Gregory B. Montgomery, Camden, N.J., for plaintiff.

Richard S. Schweiker, Secretary of Health and Human Services, Washington, D.C. by Richard J. Stout, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION

SHAPIRO, District Judge.

Francis B. Payne, a Black female, brought this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16 and § 2000e–3, following a final adverse decision by the Equal Employment Opportunity Commission ("EEOC").[1] Plaintiff alleged her August 8, 1980 removal from employment as a Quality Control Specialist in the Office of Field Assessment, Social Security Administration ("SSA"), Department of Health and Human Services, was based on racial and/or sexual discrimination or reprisal for having filed previous discrimination complaints.

---

1. Plaintiff's removal was sustained by the Merit Systems Protection Board, 6 M.S.P.B. 189, 6 M.S.P.R. ——. The EEOC concurred in this decision and issued a "right to sue" letter on February 5, 1982.

At the conclusion of plaintiff's case, defendant moved to dismiss under Fed.R. Civ.P. 41(b) for failure to state a *prima facie* case of employment discrimination. The Court, as finder of fact, agrees with the government that:

1. There is no credible evidence that plaintiff's removal was in any way influenced by the fact that plaintiff is a Black female.

2. There is no credible evidence that plaintiff's removal was influenced by or in reprisal for the plaintiff's having filed prior administrative complaints of discrimination.

This memorandum of decision constitutes the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

The following facts were agreed upon prior to trial:

Mr. Niles Brown, a (Black) male, who became plaintiff's first-line supervisor in March, 1979, notified plaintiff by memorandum dated May 9, 1980 that he proposed to remove plaintiff from federal service based on four reasons:

1. Plaintiff's failure to comply with appropriate leave procedures and her being absent without leave.

2. Plaintiff's misrepresentation of the amount of work she had performed.

3. Plaintiff's failure to meet Agency productivity standards and her failure to perform work assigned to her.

4. Plaintiff's prior disciplinary record which included five disciplinary actions against her between May, 1979 and January, 1980.[2]

A. The first reason for proposing plaintiff's removal was plaintiff's failure to comply with appropriate leave procedures and her being absent without leave (A.R. 18–22). With the exception of two days (February 29 and March 6, 1980), plaintiff was absent from work beginning February 22, 1980 until the date of the proposed removal, May 9, 1980 (A.R. 18–22, 30–46, 49–94). Of the 67 working days in this period, plaintiff at various times requested one day of emergency annual leave (February 28, 1980), four days of sick leave (February 22, 25, 26 and 27, 1980), and 36 days of advance sick leave (March 3–5, 10–21, 24–28, 31, April 1–5, 7–23, 1980). Plaintiff submitted no leave request for the remainder of the period.

Plaintiff's extended absence from work was preceded by Mr. Brown's instructions to her on February 21, 1980 to undertake a field assignment in West Virginia; the trip was to commence on February 26, 1980 (A.R. 45, 63). Plaintiff protested the assignment on the ground that she was afraid to fly; she did not appear for work the following day or week, and telephoned Mr. Brown to request four days of sick leave and one day of emergency annual leave for this period (A.R. 63–65). Mr. Brown conditionally approved the leave pending receipt of medical documentation of a bona fide illness and some explanation of the basis for emergency annual leave

**2.** The proposal to remove was accompanied by 28 Exhibits which are found in the administrative record (hereinafter "A.R.") at the following pages:

| Exhibit Number | A.R. Page Number |
| --- | --- |
| #1 | p. 30–35 |
| #2 | p. 36–39 |
| #3 | p. 40–42 |
| #4 | p. 43–57 |
| #5 | p. 58–60 |
| #6 | p. 61–79 |
| #7 | p. 79–80 |
| #8 | p. 81–82 |
| #9 | p. 83–94 |
| #10 | p. 50–55, 84–89 |
| #11 | p. 49, 90 |
| #12 | p. 48–49, 91–92 |

| Exhibit Number | A.R. Page Number |
| --- | --- |
| #13 | p. 93–94 |
| #14 | p. 95 |
| #15 | p. 318 |
| #16 | p. 319 |
| #17 | p. 326–327 |
| #18 | p. 328 |
| #19 | p. 329–330 |
| #20 | p. 331–443 |
| #21 | p. 444 |
| #22 | p. 445–446 |
| #23 | p. 447–449 |
| #24 | p. 450–452 |
| #25 | p. 453–454 |
| #26 | p. 455–458 |
| #27 | p. 499–541 |
| #28 | p. 542–549, 599–610 |

(A.R. 63). When plaintiff returned to work on February 29, 1980, the medical documentation which she submitted consisted of a note dated February 21, 1980 from the office of L.A. Principato, M.D., that stated the plaintiff was under his care and that, "Patient is truly apprehensive of traveling in arears [sic] of mountains and super highways and expressways. Patient is unable to travel in arears [sic] of this type due to a traumatic experience in the Western Park of Maryland, while conducting utilization reviews" (A.R. 38–39).

Upon inquiry, Dr. Principato stated that the note had been written by one of his office staff, that his information concerning plaintiff was based solely upon his conversation with her, that plaintiff's complaints had been limited to fear of automobile travel, and that he felt plaintiff could travel by plane, train and, quite possibly, by automobile, if accompanied by another (A.R. 41–42, 48).

Mr. Brown accordingly denied the requested sick leave on February 29, 1980 (A.R. 36) and instructed plaintiff to undertake the field assignment (A.R. 31–32, 41–42, 44–46).

The only explanation plaintiff provided for the request for emergency annual leave was "personal business" (A.R. 36, 67). Mr. Brown denied the emergency annual leave for plaintiff's failure to indicate any unforeseen circumstances preventing plaintiff from requesting annual leave, as normally required (A.R. 90), in advance of taking the leave (A.R. 31–32, 36, 44–46).

Thereafter, plaintiff telephoned the office on March 3 and 4, 1980 to request advanced sick leave for those days and last returned to work on March 6, 1980 (A.R. 45–46). At that time, the only medical documentation she submitted in support of her request for advance sick leave for March 3–5, 1979 was a leave request form which she had filled out and which appears to have been signed by Dr. Principato (A.R. 37). Mr. Brown, in a memorandum dated March 7, 1980, explained the basis for denying the request (A.R. 56–57) and again advised plaintiff in a memorandum dated March 21, 1980 that her continued absences without approved leave could be the basis for disciplinary action (A.R. 45–55).

Plaintiff then requested advance sick leave again on March 24, and once more on April 7, 1980 (A.R. 58, 79). On both occasions, she requested an additional two weeks of advance sick leave. *Id.* In support thereof, she submitted two briefs, notes signed by Dr. Principato; the first, dated March 23, 1980, stated that "Pt has been ill and is under my care till further notice—Pt next appointment 2 wk" (A.R. 60); and the second, dated April 7, 1980, stated "Pt is still ill and unable to work. She is making some progress" (A.R. 80). Plaintiff also submitted a note dated April 10, 1980, signed by Dr. Principato, stating, "Patient has been under my care from 3–3–80 to 3–5–80, 3–10–80 to present and continues to be. Because of her illness I have advised not to return to work at this time. She may return to work in approximately 2 to 4 wks, if the progress she is now making continues. Please refer to my note on 4–7–80" (A.R. 82).

Mr. Brown denied the first request by memorandum dated April 4, 1980 (A.R. 61–78) because of a lack of sufficient evidence justifying the grant of advance sick leave. In addition, Mr. Richard Colletti (White), a second-line supervisor, advised plaintiff on April 23, 1980 that her request for advance sick leave from March 10 to April 23, 1980 was denied because plaintiff had failed to submit a physician's report or any explanation for her continued absence that met the guidelines for administratively acceptable evidence (A.R. 83–94).

B. The second reason for the proposed removal was that plaintiff misrepresented the amount of work she had performed. Plaintiff's position description described the basic duty of the position was to conduct reviews or audits of determinations made by various State agencies under a federally funded program, Aid to Families with Dependent Children (AFDC), to assess the error rate in the state determinations of eligibility and amount of benefits (A.R. 31–35). Plaintiff's duties also required her

to submit a weekly report, "AFDC Federal Case Review Status Report," to notify her supervisor of the work she had performed each week.

In the work report for the week ending February 15, 1980, plaintiff stated that six new cases were assigned to her and that she had reviewed but was awaiting outstanding correspondence in all six cases (A.R. 95). These six cases comprised plaintiff's entire work product for the week. *Id.* However, "Field Reviewer's Finding Sheets," in the actual files (A.R. 99–128, 129–135, 137–184, 185–215, 216–244, 245–284, 285–317),[3] showed that the Federal Monitor's Guide requires all contacts made in the course of a review to be documented (A.R. 318), showed *no* work done in any of the cases (A.R. 99–102, 124–127, 185–188, 216–219, 245–246, 285–288, 639–642). Indeed, all of the field reviewer's sheets are blank. *Id.*

In May, June and July, 1979, Mr. Brown had repeatedly asked plaintiff to report all work undertaken and any outstanding contacts on the field reviewer's sheets (A.R. 326, 453, 513–521). Upon plaintiff's continued failure to do so, Mr. Brown advised plaintiff that the weekly report submitted by her stating there was outstanding correspondence in her cases when, in fact, a review of the actual files revealed no activity on the field reviewer's sheets, was a distortion of the work plaintiff had performed that week (A.R. 511–512). Plaintiff was reprimanded in December, 1979 for this conduct (A.R. 499–598) but, nonetheless, continued to report that her cases were pending until the arrival of outstanding material when the actual case files did not reveal any material outstanding (A.R. 320, 445–446). As late as February, 1980, plaintiff continued to submit weekly reports showing work performed which was not, in fact, documented in the actual case files.

C. The third reason for the proposed removal was plaintiff's failure to meet agency productivity standards and failure to perform work assigned to her. In March, 1979, a reminder of the weekly production goal for staff members employed in plaintiff's position was sent to the staff (A.R. 328). This was a national goal and consisted of three desk reviews per day or 15 cases per 40 hour work week. *Id.* The Monitor's Control Logs for the period July 2, 1979 to February 1, 1980 (dates are shown under the column "Date Records Requested") (A.R. 331–443, 837–949) show that, with the exception of two weeks, plaintiff reviewed no more than one-fourth of the cases available to her each week for review (A.R. 25, 331–443). Moreover, a tally extrapolated from the logs shows that plaintiff was assigned the lowest number of new cases of any member of the staff during that period (A.R. 444), despite the fact that Mr. Brown had reassigned 21 of plaintiff's cases to other staff members (A.R. 26, 445–446). Plaintiff's performance was thus clearly substandard for the period in question.

D. The fourth reason for the proposed removal was plaintiff's past disciplinary record, which included five disciplinary actions between May, 1979 and January, 1980. All of these actions were taken after affording plaintiff all of the rights to which she was entitled.

After receipt of plaintiff's response to the proposal to remove (A.R. 611–640), a decision to remove dated August 1, 1980 (A.R. 641–649) was issued; it became effective on August 8, 1980 (A.R. 679).

Prior to trial, the parties agreed that there were only two triable issues:

1. Whether plaintiff's removal from federal employment was the result of prohibited discrimination by agency officials; and

2. Whether plaintiff's removal by the agency was in retaliation for plaintiff's having filed previous complaints of racial and sexual discrimination.

---

**3.** These files are also found in a more complete form at A.R. 605–638, 639–690, 691–721, 722–750, 751–790, 791–823).

## DISCUSSION

The respective burdens of the parties under Title VII are summarized in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981):

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant, 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection'. [citation omitted]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [citation omitted].

Four elements are necessary to establish a *prima facie* case in the context of alleged discriminatory hiring:

(1) plaintiff belongs to a statutorily protected group;

(2) plaintiff was qualified for the job for which she applied;

(3) plaintiff was not selected for that position; and

(4) after plaintiff's rejection, the position remained open and the employee continued to seek applicants from persons with plaintiff's qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973).

These elements may be flexibly tailored to the particular circumstances of a case. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. Where the case involves a discharge, plaintiff may make a *prima facie* case by showing:

(1) she is a member of a protected class;

(2) she was qualified for the job she was performing;

(3) she was satisfying the normal requirements of the job; and

(4) she was the object of an adverse action.

*See McCann v. Delaware River Port Authority*, 548 F.Supp. 1206, 1214 (E.D.Pa. 1982), citing *Whack v. Peabody & Wind Engineering Co.*, 452 F.Supp. 1369 (E.D. Pa.1978), *aff'd per curiam*, 595 F.2d 190 (3d Cir.1979); *see also McClain v. Mack Trucks, Inc.*, 532 F.Supp. 486, 489 (E.D.Pa. 1982).

Thus, as part of a *prima facie* hiring case, plaintiff must eliminate the most common nondiscriminatory reasons for plaintiff's rejection: the absence of vacancy in the job sought or an absolute or relative lack of qualifications. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). Similarly, in the case of alleged discriminatory discharge, plaintiff must satisfactorily demonstrate competency at the normal requirements of her job; "[e]vidence of paper credentials ... does not demonstrate competence once hired," *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir.1981). Plaintiff "must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States*, 431 U.S. at 358, 97 S.Ct. at 1866.

To establish a *prima facie* case of retaliation, plaintiff must show that: (1) she engaged in an activity protected under the Act; (2) she was the object of an adverse action; and (3) there was a causal connection between the participation in a protected activity and the adverse action. *Goff v. Continental Oil Co.*, 678 F.2d 593, 599 (5th Cir.1982); *Novotny v. Great American Federal S & L Assoc.*, 584 F.2d 1235 (3d Cir.1978), *rev'd on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

If plaintiff successfully meets her burden of production and persuasion and establishes these *prima facie* elements, then there is an inference of discrimination or retaliation because "these acts, if other-

wise unexplained, are more likely than not based on consideration of impermissible factors." *Furnco Constr. Co. v. Walters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ Payne's *prima facie* case of racial and/or sexual discrimination fails because she did not credibly demonstrate that she was meeting the ordinary performance requirements of her job. Plaintiff admitted that she reviewed slightly less than an average of three cases a week during a seven-month period between July 2, 1979 and February 1, 1980, and that this was the lowest number of cases reviewed by any reviewer during this period. Indeed, the majority of reviewers performed two or three times more case reviews than plaintiff. Plaintiff herself admitted prior to trial that her performance was clearly substandard. Her trial testimony that by her own estimation she did her job adequately is not sufficient proof; it simply cannot be credited.[4]

From February 22, 1980 until the date of proposed removal, May 9, 1980, she was absent from work with the exception of only 2 days (February 29 and March 6, 1980) so that her competence could not have been established in the months immediately preceding her termination. But earlier, despite warnings and a reprimand in December, 1979, for failure to document and accurately report her weekly work flow and production, she continued to report that she had reviewed cases when the actual files showed no evidence that any work had been performed by her. Plaintiff's work was at an unacceptable level prior to and until her termination.

During the Spring of 1980, Payne was absent from work two and one-half months without adequate medical explanation, without a definite date of return, and without contacting her supervisor for days at a time. Payne submitted four brief notes from her physician, Dr. Luigi Principato, but these notes were intentionally vague and omitted any mention of a diagnosis or prognosis of an illness. In fact, Payne had polymyositis, or muscle inflammation, a (partially) disabling condition, controllable by appropriate medication. It is undisputed that Payne refused repeated requests from her supervisors to provide information concerning her illness and that Dr. Principato did not have his patient's consent to release any specific information. The evidence provides no basis for inferring that Payne's supervisor should have believed her extended absence was due to illness.

Rather it was logical to assume that her absence was due to her unwillingness to travel in connection with her work. Her extended absence immediately followed instructions for her to travel to West Virginia on February 26, 1980. Her treating physician's note stated that she was "truly apprehensive of traveling in arears [sic] of mountains and superhighways and expressways" because of a prior traumatic experience while working in Maryland. Brown could legitimately deny an excuse based simply on plaintiff's stated fearfulness.

Payne contended she should have been given a Fitness for Duty Examination to determine whether she was physically and mentally competent to perform her job. But she never requested such an examination prior to her notice of termination. Moreover, there was no reason to suspect that she was suffering from physical or mental illness warranting such an examination. She refused to allow her physician to reveal that she suffered from polymyositis and was being treated with Prednisone,[5] which may have made her upset and nervous at times. Payne also did not display noticeable signs of mental illness to her supervisors, and there was not at the time (or even at trial) expert testimony that Payne was mentally ill. Perhaps a particu-

---

**4.** Fed.R.Civ.P. 52 notes that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

**5.** During the relevant period, the actual dosage of Prednisone went from 7 to 1.5 mg depending on how plaintiff felt; the exact dosage could not be determined from the evidence. *See* Principato Dep., pp. 10–11.

larly aware supervisor would have suspected that Payne had neurotic (and/or depressive) tendencies from her repeated difficulties in dealing with authority, see *infra* at p. 341, although it is not clear that Niles Brown knew of such problems with previous supervisors.

All these factors regarding Payne's concealing her illness from her supervisors distinguish her case from that of co-workers terminated for known physical or psychiatric disability. There is no need to differentiate in greater detail other instances where a Fitness for Duty Examination was ordered and an employee terminated for physical or emotional reasons. The issue of whether or not Payne was entitled to such a disability termination was not before the Court by agreement of the parties. Evidence as to the availability of a Fitness for Duty Examination was admitted and considered only to the extent it was relevant to whether there was prohibited discrimination by agency officials or termination in retaliation for plaintiff's previous complaints of racial and sexual discrimination and it does not persuade the Court of either.

Because of Payne's failure to demonstrate ordinary competency at her job, she has not made out a *prima facie* case of discrimination.

■ Payne has also failed to establish a *prima facie* case of retaliation. Although she filed four administrative complaints alleging discrimination against supervisors of the Social Security Administration from December, 1975 until her notice of proposed removal in May, 1980,[6] the mere act of filing administrative complaints does not establish a *prima facie* case of retaliation. Payne failed to produce any credible evidence showing a causal connection between her complaints and her removal. It is unclear that Brown, the supervisor who recommended her termination, even knew of her complaints prior to his supervision.

There is no evidence that anyone in the Social Security Administration threatened to discipline or fire Payne for filing any grievance. Instead, the record is replete with evidence warranting plaintiff's legitimate discharge. Her failure to perform work, refusal to follow directions, and prolonged, unexcused absences amply justified removal. At times, Payne spent 75 percent of her working hours preparing her administrative complaints. While this is a protected activity, it does not justify unsatisfactory performance.

Payne also demonstrated contempt for her superiors. She consistently resisted supervision and was repeatedly insubordinate. She was counseled, warned, and reprimanded for her refusal to follow directions and failure to document and adequately report her work every week but her performance did not improve. She failed to understand the needs of the workplace and assumed co-workers and supervisors alike had to adjust to her idiosyncratic needs that were inconsistent with the requirements of the position. (With one possible exception, she deemed all of her supervisors incompetent and less qualified than she at performance review.) Plaintiff's own evidence leads a factfinder to conclude that her own failure to perform her job, for whatever reason, and not retaliation or discrimination caused her termination.

Payne was recommended for termination by Brown, a Black male. She claimed Brown was brought in to supervise and then fire her because he was Black; that is, he could protect the agency against her claims of discrimination. But Payne's assertion is simply not credible. Her own witness, Marion Douglas, who was also Black, described the negative opinions plaintiff's supervisors had of her, and found nothing to suggest these opinions

---

**6.** December 24, 1975 against Anthony Salvi (White); February 27, 1978 against Anthony Salvi and Lois Fausch (Black); July 17, 1978 against Victor Naseef (White); and January 11, 1980 against Niles Brown (Black) and Robert Zowney (White). A fifth administrative complaint was filed in October, 1980 after the proposed removal; it alleged daily harassment by several supervisors between March, 1979 and August, 1980.

were racially motivated. Only the testimony of Jose Ocasio supported plaintiff's claim of discrimination by Niles Brown. The Court cannot credit Ocasio's testimony, which was hostile and biased because of his dissatisfaction at having been pressured to resign his position with the Health and Human Services Administration.

There was not even a scintilla of persuasive evidence on the alleged sexual discrimination. The only suggestion of sexual discrimination was one witness's response to a question on cross-examination by the government that, in the opinion of that witness, a Black supervisor such as Niles Brown would treat a White man better than a Black woman. In the absence of any factual corroborating evidence whatsoever and in view of the positions of responsibility held by female employees in the agency involved, including plaintiff's witness Marion Douglas, the Court cannot find that plaintiff has met the burden of establishing any causal connection between her sex and her termination.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter.

2. The findings of the Merit Systems Protection Board and Equal Employment Opportunity Commission, which are based on an extensive evidentiary process, are entitled to some weight by this Court, *Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1960 n. 39, 48 L.Ed.2d 416 (1976).

3. Those portions of the administrative record designated by plaintiff and trial testimony offered by plaintiff to the extent the Court gives it credence do not establish a *prima facie* case that plaintiff was discharged because of her race and/or sex or in retaliation for filing grievances and complaints.

4. The evidence and record offered by plaintiff demonstrates that she did not perform her job competently; they do not support the conclusion that her supervisors' allegations of incompetence were pretextual reasons for racial or sexual discrimination or for retaliation for her complaints of discrimination.

5. Plaintiff has failed to meet her burden of establishing a *prima facie* violation of Title VII. Accordingly, defendant's Motion to Dismiss will be granted.

6. Judgment will be entered for defendant.