EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

TRAILWAYS, INC., Defendant.

Civ. A. No. 80–W–1446.

United States District Court, D. Colorado.

Nov. 13, 1981.

Lawrence D. Stone, Denver, Colo., for plaintiff.

Jones, Meiklejohn, Kehl & Lyons by Richard S. Mandelson, Denver, Colo., for defendant.

## MEMORANDUM OPINION

WINNER, Chief Judge.

This Title VII case was assigned to Judge Finesilver, but, because he was unable to finish a jury trial, at his request and with my consent the case was reassigned to me for trial. The issue is whether a "no beard" policy of Trailways violates Title VII.

 The parties agree that this is a disparate impact case rather than a disparate treatment case. That being so, proof of a discriminatory motive or intent on the part of defendant is not necessary, and the test is whether the challenged practice has a discriminatory effect. *Dothard v. Rawlinson*, (1977) 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786, and *Williams v. Colorado Springs*, (1981) 10 Cir., 641 F.2d 835. In a disparate treatment case, all an employer must do is to articulate a legitimate, nondiscriminatory reason for the practice to rebut an inference of the required intent, *Furnco Construction Co. v. Waters*, (1978) 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957; *Board of Trustees v. Sweeney*, (1978) 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216; but, in a disparate impact case, the employer bears the burden of proving that the practice under scrutiny results from business necessity. *Williams v. Colorado Springs, supra*. However, the distinction between "articulation of a reason" and "proof of business necessity" doesn't come into play in this case, because Trailways has "articulated" no reason for its policy which prohibits its drivers and other public contact employees from wearing beards and it has attempted to show no business necessity for the policy. Relying mostly on two cases which I shall discuss later, Trailways says that its "no beard" rule can't be a Title VII violation,

and that because its employment of black drivers and other public contact employees exceeds percentagewise the overall Denver or Colorado population percentage of blacks, a disparate impact case can't succeed.

The case is remarkable for its lack of controversy as to the facts. The lawsuit, brought by the Equal Opportunity Commission, results from a claim of discrimination filed by Floyd Henry, a black, who says [as does the EEOC] that Trailway's "no beard policy" discriminates against blacks. The evidence shows that Henry and other black Trailways drivers have lost their employment with Trailways because of the policy, and the evidence shows that the reason for the predicament in which they find themselves is the same for all of them. Mr. Henry and several other black Trailways drivers suffer from pseudofolliculitis barbae [PFB] which is a skin disorder resulting from ingrown hairs when persons with a particular kind of hair are clean shaven. Among laymen it is called "bumping up" and it is scientifically proven that PFB is a disease unique or at least almost unique to blacks. Dr. George B. Slipworth, a nationally recognized dermatologist who has studied and written extensively about PFB testified that he had never seen a severe case of PFB in anyone other than a black. His studies are based on a statistically significant universe (and they are supported by other medical reports) show:

### SEVERITY GRADING CHART FOR PSEUDOFOLLICULITIS BARBAE (PFB)

| Severity | Symptoms | Therapeutic Indications | Percentage of Black Males in Each Grading Category |
|---|---|---|---|
| None | No evidence of PFB. | None | 50% |
| Mild | Ingrown hairs and less than 20 papules of 2mm or greater diameter. | Trial of modified shaving techniques, chemical depilatory or Vitamin-A acid. | 25% |
| Moderate | Ingrown hairs plus 20 or more papules of 2mm or greater diameter. | Shaving abstinence. | 20% |
| Severe | Ingrown hairs plus 20 or more papules of 2mm or greater diameter, plus multiple pustules. | Shaving abstinence. | 4% |
| Very Severe | Ingrown hairs plus 20 or more papules of 2mm or greater diameter plus abscess formation; *or* ingrown hairs plus 20 or more papules of 2mm or greater diameter, plus multiple pustules, plus abscess formation. | Shaving abstinence. | 1% or less. |

This means that of the total black male population, 25% are unable to shave regularly without serious, painful disorders of the skin of the face. There is no known, effective treatment for the affliction other than abstinence from shaving, and, once afflicted, a person's PFB lasts a lifetime.[1] The United States Army permits blacks

---

1. I do not discuss the disease in more detail in light of its full description in both the majority and dissenting opinions in *Equal Employment* *Opportunity Commission v. Greyhound Lines, Inc.* (1980) 3 Cir. 635 F.2d 188, a case I shall discuss later.

with PFB to wear beards because the army has concluded that PFB is a physical disability to which only blacks are susceptible. Other public bodies grant similar exceptions from their "no beard" rules. One fourth of all male blacks are excluded from the job market under a "no beard policy", and, as I have said, Trailways didn't even articulate a reason for the rule, let alone show a business necessity for prohibiting neatly trimmed beards which can be as short as one-fourth of an inch in length to be effective in preventing PFB. I think that the question is whether a unique racial trait can be applied to eliminate one-fourth of male blacks from a job market, admitting, as I do, that there is no discriminatory intent on the part of Trailways and admitting, as I do, that the percentage of blacks employed as drivers by Trailways is a larger percentage than the percentage of blacks in the area's general population.

Quite understandably, Trailways says that *Equal Employment Opportunity Commission v. Greyhound Lines, Inc.*, (1980) 3 Cir. 635 F.2d 188, requires that the case be decided in Trailways' favor. There, Judge Aldisert, speaking for the majority said that the "wearing of beards is not a characteristic that is peculiar to any race", and, "had the issue been properly briefed and argued by the parties before us, it is possible that we may have been willing to hold that a policy against beards simply cannot constitute a Title VII violation.... However, we specifically do not meet this issue in these proceedings." I quote this language from footnote 4 to explain why I don't read the case to be as sweeping a decision as do counsel for Trailways, and I think that the question of whether, under the proper circumstances, a "no beard" policy may be a Title VII violation was not decided. I wholeheartedly agree that the wearing of beards is not a characteristic peculiar to any race, but on the proof made in this case, the characteristic which must be thought about is susceptibility to pseudo-folliculitis barbae—not the wearing of beards—and that physical characteristic is peculiar to blacks. Judge Aldisert added that in *Greyhound*, the EEOC failed to prove a greater impact on blacks than on whites, but here the Commission cured that deficiency in proof. In *Greyhound*, the Commission showed that incidence of PFB in blacks, but, inexplicably, it failed to prove the infrequency of its occurrence in whites. As the majority said in *Greyhound* :

"The Commission has simply overlooked an important element of the decision it cites. When the Supreme Court has found illegal discrimination on the basis of an employer's use of a test or physical requirement to screen applicants, it invariably has compared the impact of the test or qualification on the majority with its impact on the minority alleging discrimination."

The Commission is not guilty of the same oversight here.

In conclusion, Judge Aldisert said:

"In sum, to establish a disparate impact case here, EEOC first had to present much more dermatological information, adequately covering both white and black males, from a statistical universe large enough to be respectable, dealing with both PFB and all other skin conditions affecting black and white males in the applicant pool; and second, it had to show that enforcement of the policy resulted in actual discrimination in the employer's work force."

It is the last clause of the foregoing quotation, coupled with its reading of Judge Logan's opinion in *Equal Employment Opportunity Commission v. Navajo Refining Company*, (1979) 10 Cir. 593 F.2d 988, on which Trailways pretty much rests its argument that until the black public contact work force of Trailways falls beneath the overall area population percentage of blacks, there can be no Title VII violation. As I mentioned during trial, carried to its inevitable, logical conclusion, this argument means that a rule which said that a firm would hire no blacks under any condition would be lawful if the company already had one more black employee than the number necessary to reach the minimum percentage for the area at large. This would mean

approval of a quota system in its most blatant form, but if there is anything I thought everyone was agreed on it is that Title VII neither requires nor permits absolute quotas. The percentage of black employees of Trailways in public contact jobs is greater than the overall statistical percentage of blacks, but the record has shown that qualified blacks are being prevented from continuing their employment as Trailways drivers because they have PFB and can't shave without serious physical consequences. The reason they must wear beards is that 25% of all male blacks have PFB badly enough that they must abstain from shaving. Trailways doesn't dispute the expert testimony. Although the parties quarrel about the accuracy of statistical data submitted by defendant, I use it for purposes of illustration. It shows a 1980 male Colorado work force of:

| | |
|---|---|
| White-non Hisp | 46.31% |
| Hispanic | 5.10 |
| Black | 1.70 |
| Other | 0.64 |

Under Trailways' thinking, and applying these percentages, if there were 50 drivers employed, one of whom was black, and if there were 3 job openings for which 20 blacks applied, all 20 black applicants could be eliminated for racial reasons because more than 1.70% of the workforce was black. That's not the way I read Title VII and it's not the way I read the cases.

Trailways reads *EEOC v. Navajo Refining Co.*, (1979) 10 Cir. 593 F.2d 998, that way, and the reading is pretty much supported by the Third Circuit in *Greyhound* where it was said:

"We hold, therefore, that no violation of Title VII can be grounded on the disparate impact theory without proof that the questioned policy or practice has had a disproportionate impact on the employer's workforce. This conclusion should be as obvious as it is tautological: there can be no disparate impact unless there is a disparate impact. Our holding agrees with that of the tenth circuit in *EEOC v. Navajo Refining Co.*, 593 F.2d 988 (10th Cir. 1979). The employer in that case required a high school diploma or GED equivalent and a minimum score on an aptitude test as prerequisites for entry-level employment. Fewer Spanish surnamed Americans (SSA's) than 'Anglos' met these requirements, but Navajo used statistical adjustments to equalize the scores of the different groups. The district court enjoined use of the tests because they had a disparate impact, but the tenth circuit reversed because EEOC had not shown a disparity in actual employment. The evidence showed that SSA's made up 23.2 percent of the available workforce, thirty percent of Navajo's applicants, and thirty-eight percent of its new entry level employees. The court recognized the disparity in the numbers of SSA's and Anglos who met Navajo's requirements before the adjustments, but it saw no need to consider that point in the absence of discrimination in fact in actual numbers hired. Id. at 991. Similarly, in this case we need not consider the alleged disparate impact of Greyhound's no-beard policy because there was no actual discrimination or disparity in its hiring. EEOC argues that Navajo Refining was wrongly decided. We disagree. '[N]onvalidated tests and subjective hiring procedures are not violative of Title VII per se. Title VII comes into play only when such practices result in discrimination.' *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1381 (5th Cir. 1974), quoted in *Navajo Refining*, 593 F.2d at 991."

If *Navajo Refining* goes as far as Trailways says, its weight is at least diminished by the later case of *Williams v. Colorado Springs*, (1980) 10 Cir. 641 F.2d 835, where a different panel found discriminatory impact without reference to general population percentages. However, I think that what is overlooked is that in *Navajo Refining*, Judge Logan spelled out that there are *three approaches* to a disparate impact case. He said:

"Statistically, disparate impact can be shown in a variety of ways. It may be demonstrated that a minority, as a class, is excluded from employment at a great-

er rate than whites. Or, statistics can show that a larger percentage of minority applicants are eliminated by a test. Finally, the percentage of minorities hired can be compared with the minority population in a specific available work force to see if employment rates compare favorably with the community makeup."

■ Having said that there are *three ways* to show disparate impact, the case discusses only the third approach—a comparison of the percentage of minorities hired with the minority population in a specific available work force. Under that analysis, [where the test is comparative percentages] the employer there didn't discriminate, but this doesn't mean that the Trailways' facts cannot be tested to see (1) if "a minority, as a class, is excluded from employment at a greater rate than whites," or (2) if "a larger percentage of minority applicants are eliminated by a [rule]." The evidence here convinces that 25% of the male black workforce is effectively excluded from the Trailways' job market as a class because of a racial trait and that the rule eliminates 25% of the potential male black job applicants as compared to far less than 1% of the potential male anglo job applicants. The impact of the "no-beard" policy clearly falls more heavily on blacks than it does on whites, and I think that the principles of *Griggs v. Duke Power Co.* (1971) 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, require that actionable Title VII impact be found. I so find. *Furnco Construction Co. v. Waters*, (1978) 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957, is usually cited by employers, but this time it bites Trailways:

> "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force."

Under *Furnco*, I cannot accept Trailways' contention that just because they presently employ a percentage of blacks larger than the overall population percentage they are free to discriminate. As I read it, that's not what *Navajo Refining* stands for. The language relied upon by Trailways was limited to the last of three available ways disparate impact can be shown, and the language relied on by Trailways didn't do away with the first two tests of disparate impact recognized by Judge Logan.

■ The present policy of Trailways does violate Title VII, but this doesn't mean that the employer can't have a "no beard" policy if slight modifications are made. Trailways is not prevented by Title VII from prohibiting the wearing of beards by any public contact employee, subject to the qualification that accommodation must be made for persons who can provide a medical certificate that they are afflicted with pseudofolliculitis barbae which medically requires abstinence from shaving [or any other ailment which medically requires abstinence from shaving.] Moreover, even as to those persons, Trailways can demand that the beards be neatly trimmed at all times an employee is on duty and that the beards be worn at the shortest length which will satisfy the medical need of the employee. Unless this exception to the rule is allowed, I think that there is disparate impact on a substantial percentage of the black population wanting to apply for work with Trailways. In fact, Trailways made the exception for a while, and I don't know why it was changed.

Much has been said of an arbitrator's award in this case. The arbitration was under a union contract, and the discrimination question wasn't ruled on. Thus, I think that footnote 21 of *Alexander v. Gardner Denver*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, need not be discussed.

One more thing remains. Plaintiff wants me to give Mr. Henry $9,429.51, and the damage calculation is set forth in Exhibit 23. I have trouble adopting it, and there isn't any testimony supporting much of the claim. I don't know why Mr. Henry is necessarily entitled to the "average" income of the listed drivers any more than I know why he isn't. The claim for $598 in medical expense is one as to which I would like to see some law. The compounding of interest

is something I am not familiar with in damage cases, and I have heard nothing about Mr. Henry's efforts to mitigate. I know that he earned $4,673 from Jefferson County, but we should have testimony as to his efforts to earn more. He has the duty to mitigate.

All of this being true, this opinion cannot support a final judgment. Counsel should work on phrasing an injunction in line with this opinion and we will take more damage testimony on Monday, November 23, 1981, at 1:30 o'clock p. m. in Courtroom C–502, United States Courthouse, Denver.