**Alvin J. RICHARDSON, Plaintiff,**

v.

**QUIK TRIP CORPORATION, Defendant.**

Civ. No. 81–516–C.

United States District Court, S.D. Iowa, C.D.

July 20, 1984.

Mark W. Bennett, Allen, Babich & Bennett, Des Moines, Iowa, for plaintiff.

Jon P. Sullivan, Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa, Thomas D. Robertson, Tulsa, Okl., for defendant.

## RULING AND ORDER

STEWART, Chief Judge.

Plaintiff brought this action against the defendant, his employer, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* [Title VII] alleging that his discharge for violation of defendants "no-beard policy" constituted racial discrimination because the policy has a disparate impact on black males. Plaintiff alleges that many black males, including himself, suffer from pseudofolliculitis barbae [PFB], which can be put into remission only by growing a beard at least one-quarter of an inch long. This action came to trial on April 16, 1984. Appearances are noted in the clerk's minutes for that date. Post-trial briefing was completed on May 1, 1984. All issues in this action are now fully submitted and ready for ruling.

Before reaching the merits, the Court must decide two preliminary issues.

I. Defendant's affirmative defenses of waiver and estoppel.

■ Defendant claims that if plaintiff accepted employment with defendant knowing of defendant's no-beard policy, knowing he was medically unable to comply with the policy, and after leading defendant's agents to believe that plaintiff could comply with the policy, he has waived any right to object to the no-beard policy and is estopped from bringing this action.

The Court need not reach the disputed factual issues raised by defendant's affirmative defenses. Assuming for purposes of argument that the facts are as defendant alleges, the Court cannot accept defendant's contention. Title VII was enacted by Congress to remove artificial and arbitrary barriers to employment that have historically been encountered by blacks and other minorities. *Connecticut v. Teal*, 457 U.S. 440, 447, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). This remedial purpose

would be frustrated were equitable contract principles engrafted by federal courts to bar plaintiffs from suit in circumstances such as are presented in this action. Defendants concede plaintiff could have brought an action for failure to hire under Title VII if he had been denied employment under the no-beard policy. Thus, if defendant's argument is carried to its logical limits, it would be possible for an employer, by requiring minority employees to waive their right to sue under Title VII at the time of employment, to make itself immune from suit. Congress did not intend such a result, *see Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974), and the Court will not accept such a result. Accordingly, the Court rejects defendant's waiver and estoppel affirmative defenses as meritless.

II. Plaintiff's objection to admission of defendant's Exhibit G.

Plaintiff objected to defendant's Exhibit G, a customer satisfaction survey conducted by defendant in November 1980 to determine the level of customer concern regarding convenience store personnel with beards [hereinafter "the survey"]. Plaintiff contends that the survey was not conducted in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys.[1]

For an opinion survey to be independently admissible as evidence, the proponent must in some manner validate the sampling technique used and explain how reliability was assured. *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir.1980); *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F.Supp. 1138, 1157–58 (S.D.Tex.1982); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(17)[01], at 803–250 through 251 (1981). The burden on the proponent to show reliability is greater if the survey purports to represent subjective data, such as attitudes or beliefs, because of the inherent difficulty of accurately measuring such data. Judicial Conference of the *United States, Handbook of Recommended Procedures for the Trial of Protracted Cases*, 25 F.R.D. 351, 428–29 (1960).

The sample design of the survey was flawed in both scope and representativeness. The method by which the survey was administered leads the Court to believe that its results may be skewed by the natural propensity of the questionnaire-respondents to compare the figures in the questionnaire. The Court finds that the survey data was not shown to be reliable and, thus, would not be independently admissible to show how the average convenience store customer reacts to convenience store personnel with beards.

The data, however, is admissible, and will be considered by the Court, as the basis of Wyatt Philips's testimony concerning the decision of defendant's management not to rescind the no-beard policy in December 1980. Although the survey's data was not statistically reliable, it was of a sort that experts in the convenience store marketing field commonly and reasonably rely upon to a limited extent. As such, the Court concludes that the survey data will be admitted for the limited purpose of supporting the decision of defendant's management. *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 553 (7th Cir.1980); *see* Fed.R.Evid. 703.

III. The merits of whether defendant's no-beard policy violates Title VII on the facts presented.

A. Factfindings.

Pseudofolliculitis barbae [hereinafter "PBF"] is a facial skin condition that afflicts certain persons with curly or kinky hair follicles. After shaving, the curved hair follicles cause the already curly hair to curve back into contact with the skin surface, and pierce and re-enter the skin, forming a pseudofollicle. The pseudofollicle be-

---

1. Specifically, plaintiff contends, through the deposition-testimony of Dr. Mark Schulman, that the survey was flawed by sample-design error, lack of verification and validation procedures, lack of a control group causing reactivity in the response, and vague language in the questionnaire administered.

comes inflamed, and painful papules and pustules result. In severe cases, abscesses develop around the pseudofollicles and, if untreated, cause scarring, hyperpigmentation, and disfigurement. Once a person is afflicted by PFB, it lasts the person's lifetime.

There is no cure for PFB. A person afflicted by the condition, however, may induce remission by growing a beard one-quarter inch in length. Such "beard therapy" is the standard medical treatment for PFB. The remission obtained through beard therapy is nearly complete. The condition will redevelop if a person resumes shaving. PFB is an immutable condition that, with few exceptions, afflicts only male blacks.

Since no later than 1968, defendant has maintained appearance standards that apply to all its employees. Defendant's management developed an Officer's Procedure Manual, codifying various company policies, including the current appearance standards, one of which is the no-beard policy, which states:

Grooming.

All employees are to be clean and well-groomed. Employees may not bear beards or goatees. Employees may wear moustaches, provided they are neatly trimmed and clean; handlebar, fu manchu, and other moustaches which extend below the corner of the mouth are not acceptable.

One of the ways defendant seeks to maintain its position in a highly competitive market is by projecting a consistent, positive image of a food store (which also sells gasoline) offering fast and friendly service by clean, competent employees, in pleasant surroundings. Defendant fears that its carefully developed image will be marred if it allows an exception to its no-beard policy for persons afflicted by PFB, such as plaintiff and that customers will take their business elsewhere. Thus, defendant's management seeks to maintain its image and market share by continuing enforcement of the no-beard policy against persons afflicted with PFB.

· Defendant also contends that continued enforcement of the no-beard policy is necessary to ensure that defendant's employees continue to comply with the health regulations in the various states in which defendant has stores. The only evidence defendant presented on this point was a Tulsa, Oklahoma ordinance requiring that persons working in food establishments wear hairnets "while working at [food] processing, preparing or serving operations." Evidence presented showed that defendant's employees would not be considered to be "serving" or "processing" food while on duty at defendant's stores, except when bagging ice or, possibly, when cleaning the food self-serve equipment.

B. Law to be Applied.

Plaintiff relies on a disparate impact theory to show that he was discriminated against in his discharge by defendant. Under that theory, plaintiff need not prove that defendant acted with discriminatory intent to make out a prima facie case under the disparate impact theory. Rather, plaintiff need only show that the no-beard policy actually operates to exclude a disproportionate number of black males from employment with the defendant. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *Hawkins v. Anheuser-Busch, Inc.,* 697 F.2d 810, 815 (8th Cir.1983). If plaintiff establishes his prima facie case, then the burden of going forward shifts to defendant to show that the no-beard policy is justified by business necessity. *Griggs, supra,* 401 U.S. at 431, 91 S.Ct. at 853.

"Business necessity" as the term has been defined by the United States Court of Appeals for the Eighth Circuit, is more than administrative convenience or expediency. Defendant bears the burden of showing a manifest relationship between the no-beard policy and employment in defendant's stores. *Hawkins, supra,* at 815 (quoting *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977)). "A discriminatory practice cannot be 'justified by routine business considerations;' the employer must demon-

strate that there is a *compelling need ...* to maintain the practice." *Id.* (quoting *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 705 n. 6 (8th Cir.1980)) (Emphasis in original); *see Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 692 (8th Cir. 1983) (applying disparate impact analysis in Age Discrimination in Employment Act action).

Finally, if plaintiff and defendant discharge their respective initial burdens, the burden shifts back to plaintiff to show that another employment practice, which would not produce a discriminatory impact, would satisfy defendant's interest in an efficient and trustworthy workforce. *Hawkins, supra,* at 816.

C. Conclusions of law.

The Court will consider each element of plaintiff's prima facie case separately.

1. The plaintiff has shown that defendant's no-beard policy operates to exclude a disproportionate number of black males from employment with defendant.

■ Scientific studies indicate that between forty-five to eighty-three percent of all black males who shave may be excluded from employment with defendant because their PFB condition makes compliance with the no-beard policy insufferable. Less than one percent of white males are so hindered in obtaining employment with defendant.

2. Defendant has not shown that its no-beard policy is justified by business necessity.

■ The Court acknowledges that defendant participates in a very open, competitive market, and that defendant must take all reasonable steps to maintain and improve its position in the market.

Defendant can limit the perceived threat of customer dissatisfaction previously discussed by enforcing the no-beard policy against all employees except those who provide a medical certificate showing that they are afflicted by PFB. In addition, those employees who prove that they suffer from PFB, requiring beard therapy, can be required to maintain only short, neatly trimmed beards while on duty. The feasibility of the implementation of these steps by the United States Army and other public bodies shows that there is no compelling need to enforce the no-beard rule against all. *See EEOC v. Trailways, Inc.*, 530 F.Supp. 54, 56–57, 59 (D.Colo.1981).

Furthermore, defendant will not suffer any competitive disadvantage. Any competitors that have similar no-beard policies will be faced with similar lawsuits if they attempt to enforce it against black males with PFB. Thus, all competitors will be on equal footing.

The Court concludes that defendant's first articulated ground for enforcing the no-beard policy—that of maintaining its market share—is not a compelling, business-based need. Thus, defendant has not satisfied its burden of showing business necessity based on that ground.

■ The second ground asserted by defendant, to support its contention that there is a compelling, business-based need for the enforcement of the no-beard policy against all, is that it must do so to ensure that its employees comply with health regulations in the various states in which defendant has stores. Notwithstanding defendant's presentation of the Tulsa Municipal ordinance concerning mandatory hairnet use, the Court finds that defendant would have no more difficulty maintaining compliance with beard-hairnet regulations than with head-hairnet regulations. Thus, the Court concludes that defendant's second ground for enforcing the no-beard policy against all is also not a compelling, business-based need. In summary, defendant has not met its burden of showing business necessity for enforcing its no-beard policy against plaintiff. Plaintiff has shown that defendant's enforcement of the no-beard policy against plaintiff violates Title VII, 42 U.S.C. § 2000e-2(a)(1).

3. Plaintiff has shown that an employment policy limiting the length of the beards of employees with PFB and enforcing the remainder of its commendable grooming standards would satisfy

defendant's expressed goals without disparate impact on male blacks.

IV. Damages.

Plaintiff seeks relief in the forms of a backpay award, an attorney fee award, and an assessment of the costs of this action against defendant.

A. Backpay

■ In calculating plaintiff's recovery of backpay, the Court must seek to make plaintiff whole for the damages incurred on account of defendant's unlawful employment discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The Court may refuse plaintiff's request for backpay only for reasons that, if applied generally, would not frustrate the remedial purposes of Title VII. *Id.* at 421, 95 S.Ct. at 2373.

The parties stipulated at trial to the salary plaintiff would have received from defendant had he not been unlawfully discharged, on December 11, 1980, and the amount of salary plaintiff receives at his place of employment since June 14, 1982, United Central Bank (U.C.B.). The Court will follow a year-by-year approach to make a preliminary calculation of backpay, deducting the salary from U.C.B. from the total salary defendant did not pay plaintiff from December 11, 1980, to April 1, 1984. *See Leftwich v. Harris-Stowe State College,* 702 F.2d 686, 694–94 & n. 6 (8th Cir.1983). The calculation is set forth below.

| Year | Lost Quik Trip Salary | Actual Earnings | Backpay Owed |
|---|---|---|---|
| Dec. 15, 1980 to Dec. 15, 1981 | $ 15,737.28 | $ 0 | $ 15,737.28 |
| Dec. 16, 1981 to June 14, 1982 | 7,868.64 | 0 | 7,868.64 |
| June 15, 1982 to June 15, 1983 | 15,780.10 | 12,210.00 | 3,570.10 |
| June 16, 1983 to April 1, 1984 | 11,637.50 | 10,165.00 | 1,472.50 |
| Fringe benefits between Dec. 15, 1980 and April 1, 1984 | 420.00 | 0 | 420.00 |
| | | | $ 29,068.52 |

Defendant has not addressed the issue whether the Court should deduct unemployment benefits from plaintiff's backpay award. Neither party has briefed the issue whether the Court should allow plaintiff prejudgment interest on his backpay award. The Court will allow both parties a reasonable amount of time in which to brief either or both of these issues.

B. Attorney Fee.

The attorney fee claim made by plaintiff is separate and collateral from the merits and the issue of costs. *Obin v. District No. 9, International Ass'n of Machinists & Aerospace Workers,* 651 F.2d 574, 582 (8th Cir.1981). The Court will allow plaintiff a reasonable time to file an itemized fee application, and defendant an opportunity to object to the application.

C. Cost

■ Plaintiff has prevailed on his Title VII claim. Accordingly the Court will exercise its discretion to assess all costs of this action against defendant.

IT IS THEREFORE ORDERED that both parties shall have twenty (20) days from the date this Order is filed in which to prepare and· file briefs on the issues: (1) whether the Court should deduct unem-

ployment benefits from plaintiff's backpay award (and what amount of unemployment compensation did plaintiff receive); and whether the Court should allow plaintiff prejudgment interest on his backpay award.

IT IS FURTHER ORDERED that plaintiff shall, within twenty (20) days of the date this Order is filed, file an itemized fee application. Defendant shall, within twenty (20) days of the filing of plaintiff's itemized fee application, file any specific objections it has to plaintiff's requested fee.

IT IS FURTHER ORDERED that the Clerk of Court shall assess all costs of this action against defendant.